NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2021 VT 7

No. 2020-137

In re Richard Bowen, Esq.

Original Jurisdiction

Professional Responsibility Board

November Term, 2020

<u>Hearing Panel No. 10</u>
Jonathan Cohen, Esq, Chair
Mary Welford, Esq.
Kelley Legacy, Public Member

Christopher D. Ekman of Heilmann, Ekman, Cooley & Gagnon, Inc., Burlington, for Appellant.

Sarah Katz, Disciplinary Counsel, Burlington, for Appellee.

PRESENT: Reiber, C.J., Robinson, Eaton, Carroll and Cohen, JJ.

¶ 1. **EATON, J.** Respondent, Richard Bowen, Esq., appeals from the Professional Responsibility Board's determination that he violated two Vermont Rules of Professional Conduct in his practice as an attorney and its resulting recommendation that his license be suspended for three months. He does not challenge the panel's conclusion that he violated Rule 1.9(c)(2), but argues that it erred in holding that his behavior contravened Rule 1.8(b). Respondent further contends that, regardless of whether he violated one Professional Conduct Rule or two, a three-month license suspension represents a disproportionate sanction. We affirm.

## I. Background

¶ 2.    In June 2019, Disciplinary Counsel filed a petition of misconduct alleging that respondent violated Rules of Professional Conduct 1.8(b) and 1.9(c)(2).  See V.R.Pr.C. 1.8(b) (providing, absent narrow exceptions, that "[a] lawyer shall not use information relating to representation of a client to the disadvantage of the client"); V.R.Pr.C. 1.9(c)(2) (prohibiting, absent narrow exceptions, lawyer from revealing information relating to representation of former client).  After an evidentiary hearing on the petition, the panel made the following findings of fact.

¶ 3.    Respondent was first admitted to the bar of the Vermont Supreme Court in 1986. He initially worked in a small firm before opening his solo practice about twenty years ago. Respondent's primary area of practice is real-estate law, but he also offers additional services "typical of small-town Vermont lawyers."

¶ 4.    At the center of this case sits a small, undeveloped plot of land in Springfield, Vermont.  Respondent's first involvement with it came some years ago, when he defended its owners—then a married couple—against an action to foreclose on the property's mortgage. Following the couple's subsequent divorce, respondent agreed to represent the ex-husband (hereinafter "former client") in post-judgment divorce proceedings.  He did not obtain the ex-wife's informed consent to do so.[1]

¶ 5.    Former client sought respondent's assistance in reopening the divorce on the theory that his ex-wife had made misleading disclosures about her assets constituting fraud on the court. Both the pre- and post-judgment litigation resulted in multiple publicly available decisions issued

---

[1]    As the panel noted, Disciplinary Counsel did not charge respondent with a violation related to his representation of former client in a post-judgment divorce proceeding after having earlier represented both spouses during their marriage.  See V.R.Pr.C. 1.9(a) ("A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in . . . a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.").  The panel suggested that this information was revealed to Disciplinary Counsel for the first time in her direct examination of respondent.  It plays no part in our decision.

by the trial court and this Court. But the claims respondent filed on former client's behalf were not met with success, and his representation of former client in connection with the domestic matter ended in 2017. Thereafter, respondent billed former client approximately $11,000 for his legal services. Respondent's office sent monthly invoices to former client and, on at least a few occasions, former client and respondent discussed the outstanding bill over the telephone. Nonetheless, the fee remained unpaid, a matter which was of significant concern and impact to respondent as a sole practitioner with three employees.

¶ 6. In the divorce, former client was awarded the undeveloped Springfield lot that he and his ex-wife purchased during their marriage. He listed it for sale in 2018, drawing the interest of a married couple (hereinafter "husband" and "wife") who own and reside on an adjacent parcel. They enjoyed living next to an empty lot and were concerned by the possibility that another purchaser might build there. They decided to make an offer on the property, which former client accepted. A purchase-and-sale agreement was drawn up, contemplating a closing date of November 15, 2018.

¶ 7. For reasons irrelevant to this appeal, wife alone entered the purchase-and-sale agreement. However, husband took the lead in coordinating the transaction on the couple's behalf. In September 2018, he secured respondent's agreement to represent wife in connection with the purchase and to serve as the couple's title-insurance agent. With wife's agreement, husband was respondent's "principal contact" throughout the representation concerning their purchase of the lot. Respondent did not inform wife and husband that he had previously represented the seller in a post-judgment divorce proceeding, or that he previously represented former client and his ex-wife in an action to foreclose upon a mortgage on that same property. Nor did respondent obtain former client's informed consent to represent the prospective buyer of his land.

¶ 8. The closing was postponed several times for various reasons. By late December 2018, husband and wife had secured the necessary funding for a cash sale, and the closing was

3

rescheduled for February 7, 2019. In anticipation thereof, respondent conducted a title search on the Springfield property. He discovered several ex parte liens filed by former client's ex-wife, and learned that there was no deed quitclaiming her interest in the property to former client in the wake of their divorce. The title-insurance company informed respondent that the want of a quitclaim deed raised concerns that the ex-wife's interest in the property had not been extinguished; as a result, the company declined to insure the title.

¶ 9. Respondent informed husband and wife of this development in late January or early February and explained the benefits and drawbacks of proceeding with the purchase in the absence of title insurance. Drawing on information acquired in his post-divorce representation of former client, respondent advised his current clients that he doubted former client's ex-wife would seek to enforce any interest she might have in the property because she had inherited a substantial sum of money. Former client had not authorized respondent to disclose this information to anyone else, but respondent mistakenly believed it had been divested of confidentiality by the public availability of court records related to the divorce. This was the first time the buyers learned that the seller was their attorney's former client, and that the seller's ex-wife had allegedly inherited millions of dollars. Following this discussion, husband and wife agreed to respondent's suggestion that they ask former client to agree to indemnify them from any claims his ex-wife might make regarding the Springfield property, deciding to proceed with the purchase without title insurance.

¶ 10. Meanwhile, former client had retained Attorney Barry Polidor to represent him in connection with the sale. Beginning in late January, respondent and Attorney Polidor engaged in a series of negotiations on behalf of their respective clients, including discussions about marketability of title and the proposed indemnity agreement. At some point, respondent informed Attorney Polidor that former client owed him approximately $11,000 in unpaid legal fees and indicated that respondent intended to withhold this amount from the sale proceeds earmarked for former client. Attorney Polidor expressed concern to respondent about this proposal.

4

¶ 11.    Undeterred, on February 5, just two days before the scheduled closing, respondent emailed Attorney Polidor a copy of the unpaid bill, again insisting he would withhold the amount of the bill from the sale proceeds.  Former client had not consented to respondent disclosing the amount of the bill—or indeed, anything about his prior representation—to Attorney Polidor.  Later that day, Attorney Polidor and respondent discussed respondent's email by telephone.  Attorney Polidor told respondent that there was no lien on the Springfield property and expressed his doubt that respondent could withhold the funds absent former client's consent.

¶ 12.    The next day, respondent filed an action in civil court seeking recovery of former client's unpaid bill and moved for an ex parte writ of attachment on former client's anticipated proceeds from the sale of the Springfield property to husband and wife.  The court granted respondent's request for an attachment the same day, issuing a writ in the amount of $11,792.26 to be satisfied if that amount was either paid to respondent at the closing or placed in escrow.  Respondent promptly recorded the lien in the Springfield land records.  He neither consulted nor communicated with wife and husband before taking these steps, and they did not consent to his encumbrance of the property they sought to close on the very next day.

¶ 13.    While respondent was taking these steps, one of his employees contacted husband to request that he or wife drop off $3000 to be used at the closing.  Husband went to respondent's office with a check for that amount.  There, an employee advised husband that he needed to call respondent.  The panel credited husband's testimony that, in the ensuing telephone conversation, respondent told husband that "someone" had filed a lien against the proceeds of the contemplated sale of the property.[2]  Husband was upset and concerned that the transaction he and wife had worked to arrange could be imperiled.

---

[2]  The panel did not credit respondent's explanation that during this call, he informed husband that he himself had placed the lien and that husband expressed no concerns, but instead replied that "lawyers deserve to be paid."

¶ 14. On February 7, as the day of the closing dawned, respondent sent relevant documents to Attorney Polidor, including the writ of attachment he had just obtained. Respondent also deducted the amount of the unpaid bill on the proposed settlement statement. This was the first Attorney Polidor learned of the writ, and he contacted his own client to relay this information. Former client was distressed to discover that his past attorney was leveraging his imminent real-estate transaction to collect a fee that former client did not feel was owed. After discussing his options with Attorney Polidor, former client decided to postpone the closing scheduled for that afternoon to the next day.

¶ 15. Former client and husband then spoke directly by telephone. In this conversation, husband learned for the first time that his own attorney had encumbered the property he sought to purchase. Husband immediately called respondent for an explanation. Respondent admitted that he had filed the lien. He expressed that, a few years earlier, he represented former client in matters related to his divorce, which was "contentious" and "really, really ugly." Respondent told husband that former client was unhappy with the outcome of the litigation, and therefore did not want to pay respondent's bill of approximately $11,000. Former client never consented to the release of this information to anyone.

¶ 16. In a conversation with respondent on February 7 or 8, Attorney Polidor advised respondent that he was concerned respondent was putting the closing at risk to pursue his own interest in collecting the outstanding bill. In the face of his colleague's concerns, respondent maintained that if former client did not either satisfy his bill or place that portion of the sale proceeds in escrow pending a hearing on the writ, the closing would not take place and former client would be in breach of the purchase-and-sale contract. Respondent expressed that the only possible repercussion of his actions might be receipt of a "nasty letter" from Bar Counsel.

¶ 17. On February 8, hours before the rescheduled closing, respondent emailed Attorney Polidor to ask if former client was agreeing to escrow the amount under the writ of attachment as

6

required by the court, indicating that if former client did not do so, he could not give clear title under the purchase-and-sale agreement. The panel found that this was an attempt by respondent to use the imminent closing to leverage payment of former client's bill. Respondent deployed the threat of further delaying the closing—or of husband and wife walking away from the transaction entirely—in attempt to obtain money he believed he was owed by former client for unrelated services rendered.

¶ 18. Less than an hour before the closing, husband emailed respondent, expressing that he and wife felt that respondent had prioritized his own pecuniary interests over those of his clients, and found this behavior egregious and unethical. Indeed, in anticipation of the closing, husband and wife had arranged for workers to come to the property to clear some of it and construct a fence. The panel found that respondent's conduct caused husband and wife to experience "unnecessary stress and anxiety."

¶ 19. At the eleventh hour, former client agreed to pay one-half of respondent's asserted bill. The transaction closed. Several days later, respondent dismissed the collections case he had filed against former client.

¶ 20. On these facts, a hearing panel of the Professional Responsibility Board concluded that respondent violated Vermont Rules of Professional Conduct 1.8(b) and 1.9(c)(2) and recommended that his license be suspended for a period of three months.

## II. Analysis

¶ 21. With this background in mind, we describe respondent's arguments in greater detail. On appeal to this Court, respondent does not challenge the panel's conclusion that he violated Rule 1.9(c)(2) by revealing information relating to his representation of former client in his post-judgment divorce proceeding to husband, wife, and Attorney Polidor. However, he urges us to reverse the panel's determination that he violated Rule 1.8(b), positing that the latter violation is predicated on a clearly erroneous finding that he used information related to his representation

7

of wife to her disadvantage.  He further contends that, even if we uphold the Rule 1.8(b) violation, we should conclude that the panel's recommendation that his law license be suspended for three months represents a disproportionate sanction.

¶ 22.   On appeal, we review the hearing panel's factual findings for clear error.  A.O. 9, Rule 11(E); see also In re Strouse, 2011 VT 77, ¶ 8, 190 Vt. 170, 34 A.3d 329 (per curiam). Whether those findings are purely factual or mixed findings of law and fact, we will uphold them where they are "clearly and reasonably supported by the evidence."  Strouse, 2011 VT 77, ¶ 8 (quotation omitted).  Under this standard, findings remain undisturbed even where "contradicted by substantial evidence; rather, an appellant must show that there is no credible evidence to support the findings."  Stannard v. Stannard Co., 2003 VT 52, ¶ 8, 175 Vt. 549, 830 A.2d 66 (mem.). However, we review the panel's legal conclusions—which include its violations determinations and sanction recommendations—de novo.  In re Wysolmerski, 2020 VT 54, ¶ 22, __ Vt. __, 237 A.3d 706.  Although we carefully consider the Board's recommendation on the issue of sanctions, we "treat it as just that—a recommendation."  In re Robinson, 2019 VT 8, ¶ 27, 209 Vt. 557, 209 A.3d 570 (per curiam).  Because we bear ultimate responsibility for the discipline of Vermont attorneys, should our analysis differ from the panel's, we impose without deference the sanction we find most appropriate.  Wysolmerski, 2020 VT 54, ¶ 26; see also Vt. Const. ch. II, § 30 (endowing Supreme Court with "disciplinary authority concerning all . . . attorneys at law in the State").  Informed by these standards of review, we turn first to respondent's challenge to the panel's conclusion that he violated Vermont Rule of Professional Conduct 1.8(b).

### A.  Rule 1.8(b) Violation

¶ 23.   Rule 1.8(b) states: "A lawyer shall not use information relating to representation of a client to the disadvantage of the client unless the client gives informed consent, except as permitted or required by these rules."  Here, the panel determined that respondent used information relating to his representation of wife—specifically, the knowledge that she had entered an

8

agreement to purchase real property belonging to his former client—to secure a writ of attachment which operated to wife's disadvantage, in that it both "caused [former client] to consider whether to walk away from the transaction" and resulted in wife experiencing "unnecessary worry, stress, anxiety, and concern." Respondent argues that Disciplinary Counsel did not establish by a standard of clear and convincing evidence that his actions disadvantaged wife, noting that: no record evidence supports the conclusion that wife experienced "unnecessary worry, stress, anxiety, and concern"; the closing took place as contemplated, and any delay was not attributable to respondent's actions; he assured husband and wife that the closing would proceed regardless of whether former client paid respondent the money respondent believed was owed; and the panel's conclusion that respondent's actions caused former client to consider abandoning the deal were not supported by former client's testimony.

¶ 24.   Respondent is correct that only uses of representation-related information which disadvantage a client violate Rule 1.8(b). See V.R.Pr.C. 1.8, cmt. 5 ("The rule does not prohibit uses that do not disadvantage the client."). However, respondent misapprehends the meaning of "disadvantage" as used in Rule 1.8(b). In arguing that a showing of disadvantage requires "actual harm," respondent conflates "disadvantage," as required to show a violation of 1.8(b), with injury, a factor we consider in determining the appropriate sanction where a violation has been established. See Disadvantage, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/disadvantage [https://perma.cc/HDW3-QHJD] (explaining that "disadvantage" may mean both "loss or damage especially to reputation, credit, or finances" or "an unfavorable, inferior, or prejudicial condition," i.e., "a quality or circumstance that makes achievement unusually difficult"). A finding of "disadvantage" does not require that a client experience material damage or loss as a result of her attorney's use of representation-related information; rather, disadvantage may be found where added difficulty or prejudice arise from the same.

9

¶ 25. Thus, contrary to respondent's suggestion, the purchase did not have to fall through, be substantially delayed, or take place on terms less favorable to wife to support a finding that wife was disadvantaged by respondent's conduct. See V.R.Pr.C. 1.8 cmt. 5 (noting as example of "disadvantage" that "if a lawyer learns that a client intends to purchase and develop several parcels of land, the lawyer may not use that information to purchase one of the parcels in competition with the client" or even "to recommend that another client make such a purchase" (emphasis added)). Rather, it was sufficient that respondent's self-serving conduct put wife in a less-advantageous position relative to the closing on the property than she had been in before respondent intervened to promote his own interests. By filing the writ, respondent substantially reduced the likelihood of a timely closing, and risked undermining the sale entirely to further his unrelated pursuit of compensation from a former client. That, in itself, was a disadvantage to wife.

¶ 26. Because our conclusion that respondent used the information to wife's disadvantage does not depend on evidence that respondent's conduct either caused former client to consider abandoning the transaction or created unnecessary stress or anxiety for wife, we need not consider respondent's challenges to the panel's conclusions on those points to determine whether respondent's conduct violated Rule 1.8(b). However, because respondent raises an identical challenge to the panel's finding that wife was distressed by his conduct in connection with the "injury" prong of our sanction calculus, we address that argument infra, ¶¶ 37-39, and hold that the panel's finding was amply supported by the evidence. Accordingly, even if we concluded that the disadvantage to wife as a result of respondent's conduct did not arise directly from respondent interjecting his own financial interests into his client's—wife's—impending transaction, there is sufficient evidence that wife was disadvantaged by virtue of her reasonable reaction to respondent's conduct.

¶ 27. We uphold the panel's conclusion that wife was disadvantaged within the meaning of Rule 1.8(b) because it is clearly and reasonably supported by the evidence. See Strouse, 2011 VT 77, ¶ 8. Therefore, we also affirm its conclusion that respondent violated Rule 1.8(b).

B. Sanction

¶ 28. Having determined that the panel correctly concluded that respondent twice violated the Rules of Professional Conduct, we are left to consider the appropriate sanction. In crafting a sanction, we are guided by the American Bar Association Standards for Imposing Lawyer Discipline. Robinson, 2019 VT 8, ¶ 40 (explaining that we rely on the Standards as "a helpful guide in assigning an appropriate sanction," but are not bound thereby). The Standards call for us to weigh the duty violated, the attorney's mental state with respect to the violation, and the actual or potential injury resulting from the misconduct. In re Andres, 2004 VT 71, ¶ 14, 177 Vt. 511, 857 A.2d 803 (mem.). These considerations give rise to a presumptive sanction, against which we consider the existence of aggravating or mitigating factors in order to tailor the sanction to the unique circumstances of the case. Strouse, 2011 VT 77, ¶ 19. Sanctions are not intended to punish, but to further the twofold purpose of the Rules: to protect the public from persons unfit to serve as lawyers, and to maintain confidence in our legal institutions by deterring future professional misconduct. Wysolmerski, 2020 VT 54, ¶ 39 (citing In re Hunter, 167 Vt. 219, 226, 704 A.2d 1154, 1158 (1997)).

¶ 29. Against this rubric, the panel concluded that in breaching Rules 1.8(b) and 1.9(c)(2), respondent abdicated his duties to avoid using information relating to wife's representation to create a conflict with wife and to maintain former client's confidences. It determined that these violations implicated ABA Standards §§ 4.3 (Failure to Avoid Conflicts of Interest) and 4.2 (Failure to Preserve the Client's Confidences), respectively. It further found that respondent's mental state as to both violations was knowing, and concluded that respondent caused actual harm to both wife and former client, and placed wife at risk of even greater potential injury

11

in the form of the possible collapse of the sale. In consideration of all of these factors, the presumptive sanction under both Standards §§ 4.2 and 4.3 was suspension. After weighing the aggravating and mitigating circumstances, the panel recommended that respondent's law license be suspended for three months. Respondent argues that this sanction is disproportionate and urges us to replace it with an admonition or public reprimand.

¶ 30. In undertaking our own sanctions analysis, we, too, first consider the duties violated. Respondent does not dispute that, if his conduct in fact violated Rule 1.8(b), ABA Standards §§ 4.2 and 4.3 are each implicated here. Standards §§ 4.2 and 4.3 deal with duties owed by an attorney to clients and former clients. This is significant because, while the Standards recognize that an attorney owes duties to the general public, the legal system, and the legal profession, they "assume that the most important ethical duties are those obligations which a lawyer owes to clients." In re McCoy-Jacien, 2018 VT 35, 207 Vt. 624, 630, 186 A.3d 626, 633 (mem.) (quoting ABA Standards, Part II, Theoretical Framework, at 5). This makes sense given that an attorney's ongoing duties to his clients "aris[e] out of the nature of the basic relationship between the lawyer and the client." ABA Standards § 4.0, at 28. Thus, in violating Rules 1.8(b) and 1.9(c)(2), respondent neglected duties forming the very foundation of an attorney's ethical responsibilities.

¶ 31. With respect to scienter, respondent does not contest that if he violated Rule 1.8(b), he did so knowingly. However, he contends that he acted negligently, not knowingly, with respect to the Rule 1.9(c)(2) violation. Under the Standards, a mental state of knowledge exists "when the lawyer acts with conscious awareness of the nature or attendant circumstances of his or her conduct both without the conscious objective or purpose to accomplish a particular result." ABA Standards, Part II, Theoretical Framework, at 6. In contrast, the less-culpable mental state of negligence exists "when a lawyer fails to be aware of a substantial risk that circumstances exist or

12

that a result will follow, which failure is a deviation from the standard of care that a reasonable lawyer would exercise in the situation." Id.

¶ 32. Rule 1.9(c)(2) provides that "[a] lawyer who has formerly represented a client in a matter" may not later "reveal information relating to the representation except as these rules would permit or require with respect to a client." V.R.Pr.C. 1.9(c)(2). Respondent posits that, because the panel found that he "mistakenly believed that the publicly available court records stripped the information of the confidentiality it was due," the only appropriate conclusion was that he acted with a negligent mental state. In fact, he argues that the only finding the panel made with respect to his mental state in disclosing information about former client's divorce was that he "did not act with the most culpable mental state," seeming to suggest that the panel implicitly concluded he acted with negligence.

¶ 33. Because the line between mental states "is difficult to discern and involves factual determinations, we give deference to the panel's assessment of an attorney's mental state." In re Fink, 2011 VT 42, ¶ 38, 189 Vt. 470, 22 A.3d 461. For this reason, we must first address respondent's contention that the panel made no explicit finding as to his mental state, beyond ruling out the "most culpable" of mental states—intent. ABA Standards, Part II, Theoretical Framework, at 6 (identifying three possible mental states, in descending order of culpability: intent, knowledge, and negligence). Although the panel could have been more explicit in drawing its conclusion regarding the Rule 1.9(c)(2) violation, it clearly determined that respondent acted knowingly, and not merely negligently, as to this violation by virtue of its statement that while respondent did not act with the most culpable mental state, "nothing associated with [his] conduct can be reasonably characterized as 'negligent.' "

¶ 34. We conclude that the panel correctly assessed respondent's mental state as to the Rule 1.9(c)(2) violation. Contrary to respondent's argument, his mistaken belief that the publicly available court records altered the confidential nature of the information he disclosed has no

13

bearing on the mental state with which he acted in disclosing it. We recently addressed an identical argument in <u>Robinson</u>. 2019 VT 8, ¶ 37. The respondent in that case argued that his misconduct—engaging in a sexual relationship with a client absent a written acknowledgement of her informed consent to the potential conflict, see V.R.Pr.C. 1.7(b)(4)—was negligent and not knowing because he misapprehended the governing Professional Rule. We rejected his argument, affirming the panel's conclusion that the respondent acted knowingly "because his failure to conduct adequate legal research on conflicts of interest did not diminish his state of mind." <u>Robinson</u>, 2019 VT 8, ¶ 37. We apply the same reasoning here and arrive at the same result.

¶ 35. Vermont attorneys are tasked with maintaining conversance in the ethical obligations governing their profession. See, e.g., Vermont Rule of Admission to the Bar 11 (requiring applicants for admission to have achieved a score of eighty on the Multistate Professional Responsibility Examination); Vermont Rules of Continuing Legal Education, Purpose ("[I]t is essential that attorneys be competent regarding the . . . ethical obligations of the legal profession."). As other jurisdictions have recognized, the maxim that "mere ignorance of the law constitutes no defense to its enforcement," thus applies with particular force to lawyers, who are "charged with notice of the rules and the standards of ethical and professional conduct prescribed by the Court." <u>Office of Disciplinary Counsel v. Au</u>, 113 P.3d 203, 216 (Haw. 2005) (quotations omitted); see also <u>In re Devaney</u>, 870 A.2d 53, 57 (D.C. 2005) ("[A]n attorney is presumed to know the ethical rules governing his behavior, and ignorance neither excuses nor mitigates a violation."); <u>In re Cheronis</u>, 502 N.E.2d 722, 725-26 (Ill. 1986) ("A common maxim holds that ignorance of the law is no excuse, and this is particularly true in a case where the person who claims lack of knowledge of a relevant directive is a practicing attorney," because "[i]t is a paramount obligation of each member of the bar to study the Code of Professional Responsibility and abide by its terms and principles"). Respondent acted knowingly in revealing details of former

client's divorce to husband and wife. His mistaken belief that the disclosure was appropriate under the Rules does nothing to change the fact that he knowingly disclosed the information.

¶ 36. Having concluded that respondent had a knowing mental state with respect to both violations, we turn to the question of injury and potential injury. The Standards define "injury" as "harm to a client, the public, the legal system, or the profession which results from a lawyer's misconduct," while "potential injury" is such harm where "reasonably foreseeable at the time of the lawyer's misconduct, and which, but for some intervening factor or event, would probably have resulted from the lawyer's misconduct." ABA Standards, Definitions, at 9. The panel here concluded that respondent caused actual harm to both wife and former client, and placed wife at risk of even greater potential injury in the form of the threatened collapse of the sale.

¶ 37. The panel determined that wife "experienced actual injury in the way of the stress and anxiety that resulted from respondent's decision to let his personal interests jeopardize [her] purchase." Respondent argues that this is error, reiterating his argument—first presented in challenge to the panel's conclusion that his conduct disadvantaged wife—that the record does not support a finding that wife experienced stress or anxiety as a result of his actions. We conclude that the panel's finding is amply supported by the record evidence.

¶ 38. Husband testified that he and wife had always been "nervous" that someone would buy the lot adjacent to their small property and build a home there.[3] It was thus particularly important that the closing be successful, because the purchase was not a fungible one for the buyers—had the sale fallen through, they would have lost the opportunity to purchase the plot of

---

[3] To the extent respondent suggests that husband's testimony was not relevant on the issue of wife's mental state because respondent's agreement was solely with wife, he is incorrect. Husband explained that between himself and wife, he typically "handle[s]" such transactions, and wife agreed that husband was "more involved" in working with respondent regarding the details of the sale. Whether respondent spoke directly to wife, or whether he spoke to husband acting on her behalf, does nothing to alter the duties he owed to his client under the Rules or to lessen the impact of his conduct on his client.

land abutting their own. Indeed, when husband learned that respondent had filed a writ of attachment on the property, he was "really upset" and "didn't know what to do." He felt "helpless" and as though he and wife "got hosed." Husband sent an email to respondent, signed by himself and wife, stating, "[wife] and I both feel as though you have unethically asserted your own interests" by filing the lien two days ahead of the scheduled closing. "[W]e find it egregious," he continued, "that the [a]ttorney we have hired to represent us has inserted himself in a position to hold up the closing on said property," expressing his confusion as to why he and wife were "holding up our transaction for your business." Husband explained that, at the time he sent the email, he was uncertain of whether the sale would close as a result of respondent's actions. Moreover, wife herself testified that she retained respondent because she needed a lawyer's help, but that respondent "was not necessarily doing all that he could for me because of his conflict of interest with another party involved with the same piece of land." And although respondent argues he assured husband and wife that the transaction would go through regardless of the lien, he had taken no steps to discharge it, and it is unsurprising that his naked promise did little, if anything, to assuage their concerns.

¶ 39. In short, there is ample evidence from which the panel could draw the very reasonable inference that when respondent used information gleaned from his professional representation of wife to obtain a writ of attachment on the property she was under contract to purchase, she experienced unnecessary worry, stress, anxiety, and concern. See State v. Kerr, 143 Vt. 597, 603, 470 A.2d 670, 673 (1983) ("[P]roof of facts includes reasonable inferences properly drawn therefrom."). The existence of such stress and anxiety, in turn, supports the conclusion that wife experienced actual injury. See In re Blais, 174 Vt. 628, 628, 817 A.2d 1266, 1267 (2002) (mem.) (recognizing clients' anxiety resulting from attorney's neglect and misrepresentations as "actual injury"). Respondent does not dispute that the potential collapse of the sale was a reasonably foreseeable result of his actions. See ABA Standards, Definitions, at 9. The panel

16

correctly concluded that wife experienced both actual and potential injury as a result of the Rule 1.8(b) violation.

¶ 40. As to Rule 1.9(c)(2), respondent attacks the panel's conclusion that respondent's unauthorized disclosure of confidential information related to former client's divorce was itself an injury as conclusory in nature, arguing that no record evidence illuminates how the disclosure injured former client. Respondent's argument is predicated upon on a mischaracterization of the record. Former client testified that, while respondent represented him in connection with the post-divorce proceedings, respondent had access to all related information, including former client's financial records. Former client believed "without question" that, as a condition of his representation, respondent would keep this information confidential. Instead, respondent discussed the details of former client's divorce with husband and wife, describing it as "really, really ugly." When former client learned, in his conversation with husband, that respondent had shared information regarding his already "torturous" divorce, former client was "pretty furious." No great logical leap is necessary to support the inference that former client was harmed by respondent's behavior. See In re Pressly, 160 Vt. 319, 324, 628 A.2d 927, 930 (1993) (per curiam) (finding "further analysis . . . unnecessary" to affirm Board's conclusion that attorney's disclosure of his client's confidences "was injurious to his client to the extent that his actions caused her emotional distress"); In re Themelis, 117 Vt. 19, 23, 83 A.2d 507, 510 (1951) (explaining that "[n]o type of action involves more confidences" than divorce litigation and counting responsibility to "keep the trust and confidence that a client has placed in him" among "[p]aramount duties of a lawyer").

¶ 41. After considering respondent's mental state and the injuries and potential injuries associated with the violations, the Board found that ABA Standards §§ 4.22 and 4.32 apply best to respondent's misconduct. Having found no merit in respondent's arguments to the contrary, we reach the same conclusion. Standard § 4.22 reflects that a sanction of license suspension "is

17

generally appropriate when a lawyer knowingly reveals information relating to the representation of a client not otherwise lawfully permitted to be disclosed, and this disclosure causes injury or potential injury to a client." ABA Standard § 4.22. Standard § 4.32 provides that license suspension is likewise "generally appropriate" where a lawyer "knows of a conflict of interest and does not fully disclose to a client the possible effect of that conflict, and causes injury or potential injury to a client." ABA Standard § 4.32. We turn, then, to the weighing of factors in aggravation and mitigation.

¶ 42. The ABA Standards set forth these nonexclusive factors at §§ 9.2 and 9.3. Wysolmerski, 2020 VT 54, ¶ 40. Here, after weighing the factors, the panel concluded that the aggravating factors outweighed the mitigating factors. We agree.

¶ 43. The weightiest aggravating factor here is the "dishonest or selfish motive" animating respondent's actions. ABA Standard § 9.22(b). Respondent's motivation was selfish in that he prioritized his interest in recovering a disputed fee from a former client to the detriment of his current client's interests. And respondent's conduct in initially informing husband only that "someone," not respondent, had placed a lien on the sale proceeds lacked candor. While an attorney's conduct need not be both dishonest and selfish in order to implicate 9.22(b), the presence of both dishonesty and selfishness increases the extent of the aggravation. See Wysolmerski, 2020 VT 54, ¶ 43 (explaining with respect to 9.22(b) that while "the absence of selfishness did not make the conduct any less dishonest," "the extent of aggravation might have been greater had the conduct been both dishonest and selfish").

¶ 44. Another aggravating factor is respondent's substantial experience in the practice of law. ABA Standard § 9.22(i). At the time of these violations, respondent had been a member of the Vermont Bar for thirty-two years. See Wysolmerski, 2020 VT 54, ¶ 47 (collecting Vermont cases where "substantial experience" aggravator applied to attorneys practicing for less than twenty years). And, as the panel noted, not only did respondent have the experience to know

18

better, he had several opportunities to reconsider his actions at the behest of Attorney Polidor, who counseled respondent, "without bluster or threat," against pursuing the fee in connection with the property sale. Despite these warnings from a colleague—and even as he anticipated that his conduct might prompt a "nasty letter" from Bar Counsel—respondent remained undeterred. See Preamble: V.R.Pr.C. at ¶ 7 (explaining that in addition to the Rules of Professional Conduct and "personal conscience," "a lawyer is also guided by . . . the approbation of professional peers"). We agree that this implicates § 9.22(g), which provides that an attorney's refusal to acknowledge the wrongful nature of his conduct may be an aggravating factor. Finally, respondent's dual violations of the Rules of Professional Conduct are an aggravating factor under § 9.22(d). See Robinson, 2019 VT 8, ¶ 72 n.15 (explaining that violation of multiple Professional Rules implicates § 9.22(d)).

¶ 45. As to mitigation, we note that respondent has no prior disciplinary history, despite his long career. ABA Standard § 9.32(a). We also find that some slight mitigation arises from respondent's cooperative attitude toward the disciplinary proceeding. ABA Standards § 9.32(e). But because attorneys have an independent professional duty to cooperate with disciplinary investigations under Rule 8.1(b), this factor is afforded little weight. Wysolmerski, 2020 VT 54, ¶ 50; In re Farrar, 2008 VT 31, ¶ 9 n.2, 183 Vt. 592, 949 A.2d 438 (mem.). The aggravating factors predominate here.

¶ 46. Finally, respondent argues that a three-month license suspension is a disproportionate sanction when compared with several other disciplinary cases. In re Adamski, 2020 VT 7, ¶ 50, __ Vt. __, 228 A.3d 72 (per curiam) (explaining we "look[] to sanctions imposed in other cases to aid us in measuring out a sanction" (quotation omitted)). As we have recognized, "meaningful comparisons of attorney sanction cases [can be] difficult as the behavior that leads to sanction varies so widely between cases." Id. (quoting Robinson, 2019 VT 8, ¶ 74). This case,

like some others, lacks meaningful analogs; as a result, the case comparisons proffered by respondent are not persuasive.

¶ 47.    Respondent cites Adamski, a recent decision in which we ordered a fifteen-day suspension for an attorney who sought to conceal a settlement check from her firm in order to maximize her spouse's (the client's) financial interest in the recovery, violating her duties owed to the general public and to the legal profession to refrain from dishonest or deceitful conduct.  Id. ¶ 1. Significantly, we explicitly rejected Disciplinary Counsel's argument that the respondent had violated duties owed to her client.  Id. ¶ 35. Rather, the respondent's misconduct in Adamski was a breach of the "trust and confidence" forming the foundation of "most law partnerships."  Id. ¶ 27 (quotation omitted).  But "dishonest and deceitful actions" directed at other members of a law firm in order to "maximize [respondent's] own financial interests at the firm's expense," is a different sort of harm than that arising from violation of a duty owed to a client.  Id.  As noted above, the Standards appropriately assume that those duties owed by attorneys to clients are the most important ethical duties.  See ABA Standards, Part II, Theoretical Framework, at 5.  We conclude that respondent's comparison to Strouse, a case in which we imposed a public reprimand, is unavailing for the same reason.  2011 VT 77.  In that case, the respondent's conduct caused harm to a client, but did not involve fraud, deceit, or misrepresentation directed toward a client—rather, the respondent's fraud was "aimed primarily" at her firm.  Id. ¶ 23.  In contrast, respondent's violations here struck at the heart of the fiduciary responsibilities he owed to his clients and former clients.  They therefore warrant the recommended sanction.

¶ 48.    Similarly, respondent's comparison to other cases turning on a lawyer's violation of the law is unhelpful.  See In re Mayer, 159 Vt. 621, 623, 617 A.2d 153, 155 (1992) (mem.) (imposing two-month suspension for attorney's attempt to receive cocaine); see also In re Massucco, 159 Vt. 617, 617, 613 A.2d 718, 718 (1992) (mem.) (imposing four-month suspension for failure to file income tax returns); In re Taft, 159 Vt. 618, 618, 613 A.2d 717, 717 (1992)

20

(mem.) (same). Respondent argues that unlike those attorneys sanctioned for violations of the law, he has committed no crime, and therefore his sanction should be less. He is incorrect—in fact, under the Standards, the "imposition of other penalties or sanctions" is a factor to be considered in mitigation. ABA Standards § 9.32(k). Although a lawyer engaging in illegal conduct "may tend to lessen public confidence in the legal profession," see In re Berk, 157 Vt. 524, 531, 602 A.2d 946, 950 (per curiam) (quotation omitted), such conduct does not necessarily implicate an attorney's fundamental duties to his clients.

¶ 49. We thus abjure the argument that a three-month suspension represents a disproportionate sanction. Given respondent's knowing mental state with respect to both violations, his dishonest and selfish motivation, and the fact that he violated the most important ethical duty owed by an attorney—his duty to his clients—an admonition or public reprimand would be insufficient to maintain confidence in our legal system. Cf. In re Scholes, 2012 VT 56, 192 Vt. 623, 626, 54 A.3d 520, 524 (mem.) (explaining admonition or public reprimand generally imposed "[i]n cases of neglect where there is little or no injury and no other substantial violation"). As the panel noted, a finding of intent with respect to the Rule 1.8(b) violation was a narrow miss, and "courts generally disbar lawyers who intentionally exploit the lawyer-client relationship by acquiring an ownership, possessory, security or other pecuniary interest adverse to a client without the client's understanding or consent." ABA Standards, § 4.31 cmt., at 31. Nor is a three-month suspension a particularly severe one, given that the Standards provide that suspension should generally "be for a period of time equal to or greater than six months." ABA Standards, § 2.3, at 10; see also A.O. 9, Rule 22(b) (providing that only attorney suspended for six months or longer need petition for reinstatement before resuming practice).

¶ 50. Trust and confidence form the foundation of the attorney-client relationship. See 2 Mallen and Smith, Legal Malpractice § 14.1, at 230 (4th ed.) ("The fiduciary obligations are the foundation of the attorney-client relationship and enable a client to fully reveal confidences and to

repose unhesitating trust in the attorney's ability to represent the client's interests diligently and competently."). In straying from these fundamental obligations, an attorney risks eroding public trust in the profession as a whole—a trust without which our legal system cannot function. People ex rel. Dep't of Corps. v. Speedee Oil Change Sys., Inc., 980 P.2d 371, 379 (Cal. 1999) ("The effective functioning of the fiduciary relationship between attorney and client depends on the client's trust and confidence in counsel."). Therefore, the appropriate sanction must be weighty enough to counter this serious risk. See Accident & Injury Med. Specialists, P.C. v. Mintz, 2012 CO 50, ¶ 25, 279 P.3d 658 (en banc) (describing attorney-client relationship as "distinctly a fiduciary relationship . . . founded up a special trust and confidence" and explaining that "[t]o promote such trust and confidence, attorneys are governed by rules of conduct overseen by [the state Supreme Court]"). Here, "[m]erely to express disapproval, or censure, would be to treat lightly matters vitally affecting the integrity of the profession and the interests of society." Themelis, 117 Vt. at 24, 83 A.2d at 510-11 (imposing three-month license suspension as sanction). We conclude that a three-month suspension is necessary here, not as punishment, but in order to maintain public confidence in our legal institutions.

Affirmed. Respondent is suspended from the practice of law for three months; his suspension will begin on the date the mandate executes under Vermont Rule of Appellate Procedure 41.

FOR THE COURT:

_____

Associate Justice

22