NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2022 VT 33

No. 21-AP-230

In re Paul Kulig                                              Original Jurisdiction
(Office of Disciplinary Counsel, Appellant)
                                                             Professional Responsibility Board

                                                             March Term, 2022


Hearing Panel No. 8
Jennifer E. McDonald, Esq., Chair
Jonathan T. Rose, Esq., Member
Patrick Burke, Public Member

Samantha V. Lednicky of Catamount Law, PLLC, Burlington, for Appellant.

Timothy L. Taylor, Grand Rapids, Michigan, for Appellee.


PRESENT:  Reiber, C.J., Eaton, Carroll and Cohen, JJ., and Waples, Supr. J.,
                Specially Assigned


¶ 1.    **PER CURIAM.**   In this case, a Professional Responsibility Board (PRB) hearing panel determined that respondent violated several ethical rules in drafting a will and deed that conveyed an elderly client's real property and personal estate to himself. It imposed a three-month suspension as a sanction. The Court ordered review of this decision on its own motion. We agree with the panel that respondent violated the rules in question but conclude that a five-month suspension is appropriate given the nature of the violations and the serious harm caused by respondent's conduct.

## I. Hearing Panel Decision

### A. Findings

¶ 2.    The panel made the following findings after a hearing.[1] Respondent was admitted to the Vermont Bar in 1978 and has practiced in Vermont since that time. He provided estate-planning legal services to client L.Z. for many years until her May 2018 death. Respondent and L.Z. lived in the same community and attended the same church; respondent considered L.Z. a family friend.

¶ 3.    Respondent drafted a series of wills for L.Z. L.Z. had no children and her husband predeceased her. Her 2006 will left her assets to a niece, her niece's two children, and three children of L.Z.'s nephew. At L.Z.'s request, respondent prepared a new will in February 2011 that left L.Z.'s house and its contents to her nephew and his wife; any remaining bonds to her nephew's three children; and the remainder of her estate to her sister.

¶ 4.    In 2014, respondent met with L.Z. to discuss estate planning, nursing care, and Medicaid issues, given her declining health. Because L.Z. wanted to remain in her home, respondent advised L.Z. to use a so-called "enhanced life estate" (ELE) deed to prevent the value of her house from being counted as a financial asset with respect to Medicaid coverage. An ELE deed allows a grantor to convey real estate to a third party while reserving a life-estate interest in the property along with the right to sell or mortgage the property. Respondent further advised L.Z. that she could bequeath her real and personal property via a trust agreement.

¶ 5.    Under the trust arrangement purportedly discussed by the parties, L.Z. would convey her real property via an ELE deed to someone who would serve as trustee of the trust and, upon L.Z.'s death, the trustee would sell the real property and distribute the proceeds to the trust

---

[1] In his brief, respondent's counsel discusses "findings" that were not made by the panel and that appear to rest primarily on respondent's own testimony. These are not findings of fact and we do not treat them as such.

2

beneficiaries. A new will would also be prepared naming the trustee as the executor and sole beneficiary of L.Z.'s estate with the understanding that any of her other property that might require the filing of a probate estate would go to the trustee, who would then distribute the property (or funds from the sale of the property) to the trust beneficiaries.

¶ 6. Respondent testified that L.Z. accepted his advice with respect to this arrangement. According to respondent, L.Z. wanted him to receive the ownership interest in her real property and perform the roles described above. Respondent then drafted an ELE deed and a new will along these lines. The ELE deed provided for the conveyance of L.Z.'s ownership interest in her home to respondent and his heirs and assigns and the new will left "all of [her] estate" to respondent and appointed him as the executor of her estate.

¶ 7. Respondent briefed a partner at his law firm on his discussions with L.Z. and asked the partner to have L.Z. execute the ELE deed and will. The partner had concerns about the proposed transfer but ultimately agreed to respondent's request. L.Z. executed the documents in 2014 and the partner concluded that she was of sound mind and "comfortable" conveying her property to respondent. At the PRB hearing, the partner had a vague recollection of his meeting with L.Z. and he relied heavily on cursory notes that contained unexplained discrepancies.

¶ 8. The panel found that respondent's drafting of these documents created a conflict of interest on respondent's part. L.Z. did not sign any document that disclosed this conflict of interest to her or that described the nature of the risks associated with conveying her home to respondent and designating respondent as the beneficiary of her estate.

¶ 9. Respondent did not file the ELE deed in the land records or the will in the Probate Division. Before L.Z.'s death, respondent generated no written record that set forth or otherwise contemporaneously memorialized the terms of the trust including identifying the corpus of a trust and its scope, the identity of the trustee and his related powers and duties, the identity of the beneficiaries of the trust, or a formula for distribution to the beneficiaries.

¶ 10.  L.Z. eventually moved into a nursing home in New York and executed a durable power of attorney, drafted by respondent, designating respondent as her agent.  During this time, L.Z.'s assets were used for her care and maintenance.  L.Z. died at the nursing home in May 2018.

¶ 11.  In the months following L.Z.'s death, respondent did not file her will with the Probate Division or otherwise seek an appointment as the executor of L.Z.'s estate.  He did not advise any potential beneficiary that a trust was set up by L.Z. and that he was serving as trustee, or describe to any potential beneficiary his authority or intentions.  He did not generate or provide any inventory of L.Z.'s personal and real property to any beneficiary or heir at law.

¶ 12.  Respondent did secure L.Z.'s former residence, including her furniture, and took her jewelry and photographs into his possession.  He had the jewelry appraised (approximately a $2000 value) but took no steps to sell it or make it available to any beneficiary for viewing.  He donated L.Z.'s clothing to her nursing home.  At the time of the PRB hearing, respondent still had L.Z.'s jewelry and photographs in his possession.  With respect to the house, respondent paid for utilities, property taxes, and homeowner's insurance, as well as a water system repair, using his own funds.

¶ 13.  At some point in 2018, the widow of L.Z.'s nephew (a beneficiary in an earlier will) asked respondent about L.Z.'s estate.  Respondent replied, "there is no estate."  He did not tell nephew's widow that L.Z.'s remaining assets would be distributed pursuant to a trust agreement, and he provided no further information to her.  Nephew's widow eventually obtained an attorney to assist her.  In October 2019, the attorney contacted respondent, who provided some additional information but did not send copies of the 2014 will or 2014 ELE deed as requested.  The attorney followed up again with respondent, seeking these items and requesting information regarding L.Z.'s bank accounts, personal effects, and an accounting with respect to rent based on his understanding that someone was living in L.Z.'s house.

4

¶ 14. Respondent replied in a December 2019 letter and provided copies of the 2014 will and ELE deed. Respondent said that the assets L.Z. had intended to convey to her sister and "other relatives" had been spent on L.Z.'s long-term care; the rental payments had been used to cover expenses associated with the house; and when L.Z.'s house was sold, he would distribute the proceeds to "those she had intended to benefit before her declining health required her to use her assets for her end-of-life care." Respondent did not tell the attorney that a trust had been put in place, identify any beneficiaries by name, or tell the attorney that nephew's widow was not an intended beneficiary. He did not provide the attorney with the requested accounting. The attorney again followed up with respondent, seeking clarification and additional information, without success. In January 2020, a PRB complaint was filed against respondent.

¶ 15. Meanwhile, in the summer of 2019, more than one year after L.Z.'s death, respondent sold L.Z.'s car for $1000 to a friend with whom he also had a business relationship and who was also a former client. Respondent deposited the funds from the sale of the car in his personal bank account. Respondent also advised this friend that he planned to sell L.Z.'s house. The friend was going through a divorce and respondent knew that the friend's wife was looking for a house. Respondent neither had the property appraised nor did he retain a real estate agent to determine an appropriate listing price. He relied on the property's value in the town's grand list and his own opinion to establish a sale price.

¶ 16. In the fall of 2019, respondent entered into a "rent-to-own" agreement with his friend's wife. She made a down payment of $10,000, to be applied retroactively to rent if she opted not to purchase the home. The parties also agreed that the friend's wife would receive credits against the purchase price for payments made to vendors to repair and improve the house. While the house was structurally sound, it needed major repairs to the furnace and septic system. The wife moved into L.Z.'s former residence in December 2019.

5

¶ 17.    Respondent placed the $10,000 down payment in his personal bank account. Respondent testified that he did so to reimburse himself for expenses incurred in maintaining the house.  The panel found that respondent failed to provide a definitive accounting concerning reimbursement or any other evidence regarding the precise amount of expenses claimed or the current location of the remaining balancing of the $11,000 (representing the down payment and the car payment).

¶ 18.    The friend's wife closed on the home in May 2020.  Respondent was listed as the seller on the closing documents with no indication that he was acting as a trustee.  The wife received approximately $43,000 in credits for improvements she made, which included remodeling the kitchen.  As a result of her purchase, the wife lived in the house rent-free for six months.

¶ 19.    Respondent received approximately $153,000 from the sale, including the $10,000 deposit.  This was significantly lower than the property's value in the town's grand list of $197,000.  Respondent argued that the improvements made by the wife were necessary to satisfy a lender that the property would have sufficient value to support a bank loan for the purchase of the property.  Respondent placed the money he received at closing ($143,000) into his client trust account.  He did not provide notice of the sale to anyone as a beneficiary either before or after the closing.  He did not give anyone as a beneficiary the opportunity to view the contents of the house before the sale.  Respondent concluded that the contents of the house (aside from the jewelry and photographs) had no value, and he left them in the house at closing.  At the time of the panel's September 2021 decision, respondent had not provided any heir or beneficiary an accounting of the various expenditures and receipts related to the sale of the house.

¶ 20.    Respondent conceded that the trust arrangement he claimed to have set up was "a little unusual," but he considered it legal and appropriate.  He stated that he had not previously structured an estate with conveyances to himself with an oral trust agreement, but he claimed to have done so because L.Z. insisted that he was the only person she could trust to effectuate her

6

wishes. He also claimed to have advised L.Z. to use someone else as trustee and grantee, as well as to consult with another lawyer, and that she "adamantly declined to do so." Respondent was aware of the danger inherent in using an ELE deed for estate planning, and specifically, the risk that the person granted an ownership interest via an ELE deed would elect not to fulfill the grantor's wishes following the grantor's death.

¶ 21. According to respondent, L.Z. wanted her property to be distributed as if she died intestate. Respondent acknowledged that L.Z.'s car was subject to the terms of her will but maintained that, had he opened a probate estate, creditors' claims would have been far greater than the car's value. Respondent testified that he did not distribute any property because of the pending PRB proceedings; he was contacted by Bar Counsel in January 2020 prior to the May 2020 closing on the sale of L.Z.'s home. Respondent stated that, at some unspecified point in time, he intended to provide notice by statute of a proposed distribution of the funds from the sale of L.Z.'s home, along with an accounting of expenses and receipts. He had not prepared any comprehensive accounting by the date of the PRB hearing.

## B. Conclusions

¶ 22. Based on these and other findings, the panel concluded that respondent violated Vermont Rules of Professional Conduct 1.7 and 1.8. Rule 1.7 allows an attorney to represent a client notwithstanding the existence of a concurrent conflict of interest under certain specified circumstances, including that "each affected client gives informed consent, confirmed in writing." V.R.Pr.C. 1.7(b)(4); see also V.R.Pr.C. 1.0(b), (e) (defining "confirmed in writing" and "informed consent"). "A concurrent conflict of interest exists if: . . . there is significant risk that the representation of one or more clients will be materially limited by . . . a personal interest of the lawyer." V.R.Pr.C. 1.7(a)(2); see also V.R.Pr.C. 1.7 cmt. [10] ("The lawyer's own interests should not be permitted to have an adverse effect on representation of a client.").

7

¶ 23.    The panel found that respondent's representation of L.Z. gave rise to a concurrent conflict of interest on his part because he drafted documents that advanced his personal interests. He had a duty to provide L.Z. with completely independent advice but instead placed himself in a position where he was advising her to convey her property to him and make him the sole beneficiary of her estate under a will. The panel found a significant risk under these circumstances that respondent's advice would be colored by his personal interests. It also found a significant risk in using an ELE deed for estate-planning purposes. Even assuming that respondent did not intend to keep the money for himself, he placed himself in a position where he could do so.

¶ 24.    The panel emphasized that, to fulfill his ethical duties, respondent needed to advise L.Z. to obtain legal representation from a disinterested attorney and inform her that he could not represent her in making those decisions or in drafting documents that conveyed property to him and made him the sole beneficiary of her estate. The panel rejected respondent's attempt to blame L.Z. for his violation of the rules and noted that, because L.Z. had died, there was no meaningful way to verify respondent's version of events.

¶ 25.    The panel then turned to Rule 1.8(c), which provides that "A lawyer shall not solicit any substantial gift from a client, including a testamentary gift, or prepare on behalf of a client an instrument giving the lawyer or a person related to the lawyer any substantial gift unless the lawyer or other recipient of the gift is related to the client." V.R.Pr.C. 1.8(c) (emphasis added). This prohibition is based on "concerns about overreaching and imposition on clients," and a client cannot provide informed consent to such a transaction. V.R.Pr.C. 1.8, cmt. [6]. Even if a lawyer does not "solicit" a gift, moreover, "such a gift may be voidable by the client under the doctrine of undue influence, which treats client gifts as presumptively fraudulent." Id.

¶ 26.    Given the conflicting evidence, the panel could not conclude by the required standard of proof that respondent violated Rule 1.8(c) by "soliciting" a substantial gift from L.Z. when he recommended that she bequeath and devise her personal and real property to him. It did

8

conclude, however, that respondent violated Rule 1.8(c) by "prepar[ing] on behalf of a client an instrument"—here, the 2014 ELE deed and will—"giving the lawyer . . . [a] substantial gift."

¶ 27. The panel explained that violations of the prohibition against preparing an instrument giving a substantial gift to a lawyer were routinely found when a lawyer drafted a will that conferred beneficiary status on the lawyer or a person related to the lawyer. It concluded that the prohibition in Rule 1.8(c) was plainly worded and without exception. It rejected respondent's assertion that he did not understand the documents to confer a gift to him, concluding that it provided no defense to the rule violation and that other courts had reached similar conclusions. Regardless of his intent, the panel held that respondent placed himself in a position to keep L.Z.'s real property or to claim her property under the will following her death.

¶ 28. The panel then considered the appropriate sanction, looking to the American Bar Association's Standards for Imposing Lawyer Sanctions. See In re Wysolmerski, 2020 VT 54, ¶ 27, 212 Vt. 394, 237 A.3d 706 ("Where a violation of the Rules of Professional Conduct has occurred, the American Bar Association's Standards for Imposing Lawyer Sanctions guide our sanctions determinations."); ABA Ctr. for Pro. Resp., Standards for Imposing Lawyer Sanctions (1986) (amended 1992) [hereinafter ABA Standards]. It found that respondent violated a duty of loyalty to his client; he acted knowingly, i.e., "[w]ith conscious awareness of the nature or attendant circumstances of his . . . conduct both without the conscious objective or purpose to accomplish a particular result," ABA Standards, Part II, Theoretical Framework, and his conduct caused serious actual harm to L.Z., her potential beneficiaries, and the legal profession. The panel found its assessment of harm somewhat tempered by the fact that respondent secured the client's house, paid expenses necessary to maintain the house, sold the house, did not dissipate the funds from the sale of the home or car (apparently because he used the funds to reimburse himself for home maintenance costs and placed the remaining funds from the home sale into his client trust account), and eventually disclaimed any interest in the client's property through the will and deed.

9

¶ 29.    The presumptive sanction was a suspension, and the panel determined that the aggravating and mitigating factors, discussed below, did not warrant a departure from this presumptive sanction.  The panel looked to In re Bowen, 2021 VT 7, __ Vt. __, 252 A.3d 300, in determining the appropriate length of the suspension.  The Bowen Court upheld a three-month suspension for several conflict-of-interest violations.   While the cases involved different aggravating factors, the panel concluded that the Bowen sanction analysis was comparable and determined that a three-month sanction was appropriate here.  That sanction was imposed during the pendency of this appeal.

## II.  Supreme Court Review

¶ 30.    On appeal, we will uphold the hearing panel's factual findings unless they are clearly erroneous, meaning that "there is no credible evidence to support" them.  Id. ¶ 22.  The Supreme Court exercises "disciplinary authority concerning all judicial officers and attorneys at law in the State," Vt. Const. ch. II, § 30, and thus we "review the panel's legal conclusions—which include its violations determinations and sanction recommendations—de novo." Bowen, 2021 VT 7, ¶ 22 (citation omitted).  While "we carefully consider the Board's recommendation on the issue of sanctions, we treat it as just that—a recommendation." Id. (citation omitted).  "Because we bear ultimate responsibility for the discipline of Vermont attorneys, . . . we impose without deference the sanction we find most appropriate." Id. (citations omitted).

¶ 31.    The panel's findings are supported by the record, and they support its conclusions that respondent violated Rules 1.7 and Rule 1.8(c).  We impose a five-month suspension given the serious actual and potential harm that resulted from the misconduct and the nature of the violations, particularly the violation of a clear prohibition on attorneys drafting documents that convey client property to themselves.

A. Rule Violations

¶ 32. We begin with the rule violations. As set forth above, Rule 1.7 provides that a "lawyer shall not represent a client if the representation involves a concurrent conflict of interest" unless, among other things, "each affected client gives informed consent, confirmed in writing." The panel concluded that respondent violated this rule "by providing legal advice to L.Z. that included the drafting and presentation of legal documents that gave him interests in his client's real property and her estate."

¶ 33. This conclusion is supported by the findings and the record. Respondent had a duty to provide L.Z. with independent advice, but he put himself in a position where he was advising her to convey her property to him, which she did. There was a significant risk that his advice would be colored by his personal interests. It is undisputed that respondent failed to secure L.Z.'s informed written consent to continued representation. We reject any argument that the violation was justified because the client "insisted" on this arrangement. As another court observed under similar circumstances, if the client had "been given the benefit of independent counsel," her "instructions m[ight] have been much different." In re Gillingham, 896 P.2d 656, 664 (Wash. 1995).

¶ 34. Respondent contends, as he did below, that there was no conflict of interest because he had no personal interest at stake in the transaction and received the client's assets only in a trustee capacity. The panel made no such finding; in fact, it rejected this argument. As set forth above, it found that respondent drafted documents that conveyed L.Z.'s property to him personally, creating a risk that he could act in his own self-interest and treat this property as his own rather than carrying out the client's wishes. While respondent disagrees with the panel's finding, he fails to show that it is clearly erroneous. In re Wysolmerski, 2020 VT 54, ¶ 23 (recognizing that "[r]econciling conflicting testimony is the province of the factfinder" and that party's disagreement with finding does not render it clearly erroneous).

11

¶ 35. The panel's conclusion that respondent violated the plain terms of Rule 1.8(c) by "prepar[ing] on behalf of a client an instrument giving the lawyer . . . any substantial gift" is equally supported by its findings.[2] See generally G. Hazard, Jr. et al., The Law of Lawyering, § 13.01 (4th ed.) (recognizing that Model Rule 1.8 "provides a series of specific application of . . . basic conflict of interest principles" and the requirements of Rules 1.7 and 1.8 "should be read as cumulative rather than as in the alternative"). As to this violation, respondent again argues on appeal, as he did below, that he was acting as a trustee of L.Z.'s property and that he intended to distribute that property to others. He sets forth Vermont law on the creation of oral trusts and argues that the requirements for an oral trust were satisfied here.

¶ 36. The hearing panel found it unnecessary to decide if in fact an oral trust was created, emphasizing its role as an administrative body of limited jurisdiction and not a court of law. The panel explained that its role was limited to deciding if respondent violated the Rules of Professional Conduct, and it did not need to determine if an oral trust was created to resolve that question. The panel also noted that there were others who might have standing to litigate whether a trust was in fact created, assert related claims, and present and challenge evidence on this point, and those individuals were not parties to the PRB proceeding. The panel further found that respondent identified the supposed beneficiaries of the alleged oral trust for the first time at the PRB hearing, and he testified that he had not notified any of these individuals of their status as beneficiaries; none of the supposed beneficiaries testified in the PRB proceeding.

¶ 37. We agree that it is neither necessary nor appropriate, for the reasons identified by the panel, to decide based on this record whether in fact an oral trust was created. Respondent's claimed intent to convey the property to others once he received it (pursuant to documents that

---

[2] We do not disturb the panel's weighing of the evidence and consequent assessment that the record lacked clear and convincing evidence that respondent "solicited" a substantial gift from L.Z. in violation of Rule 1.8(c).

conveyed it to him unequivocally) does not excuse his violation of the plain prohibition imposed by this rule. He prepared a document that gave L.Z.'s property to himself without restriction.

¶ 38. As the rules make clear, "[a] lawyer who drafts a will in which he or she is named a beneficiary is involved in a facial and obvious conflict of interest." Gillingham, 896 P.2d at 663. The rules "eliminate the conflict of interest inherent in a lawyer's drafting a will from which he or she substantially benefits by banning the practice." Id. The practice is banned because it "is inherently permeated with the dangers of self-dealing and undue influence." Id.; see also Comm. on Pro. Ethics & Conduct of the Iowa State Bar Ass'n v. Behnke, 276 N.W.2d 838, 844 (Iowa 1979) (recognizing "appearance of impropriety inherent in these situations").

¶ 39. Respondent is responsible for the "necessary legal effect" of the documents he drafted even assuming arguendo that he did "not appear consciously to have considered the transaction a gift." In re Gildea, 936 P.2d 975, 981 (Or. 1997). Even without "ill intent," these types of transactions "cause the public to lose confidence in the integrity of the legal profession," which is why they are categorically prohibited. State v. Gulbankian, 196 N.W.2d 730, 731-32 (Wis. 1972); see also Att'y Grievance Comm'n of Md. v. Saridakis, 936 A.2d 886, 896 (Md. 2007) (finding that "appearance of impropriety is enough to constitute a violation" of rule prohibiting lawyer from drafting documents that convey client property to themselves); Att'y Grievance Comm'n of Md. v. Kent, 653 A.2d 909, 919 (Md. 1995) ("In order to maintain public confidence in the legal system, lawyers must avoid not only actual acts of misconduct but even the type of behavior that can suggest misconduct."); see also In re Adamski, 2020 VT 7, ¶ 53, 211 Vt. 423, 228 A.3d 72 (recognizing that "[t]he public as well as [the attorney's] clients and the courts have an interest in [the attorney's] integrity and are entitled to require that [the attorney] shun even the appearance of any fraudulent design or purpose" (quotation omitted)). Any argument that L.Z. "insisted" on the arrangement is unavailing under the plain language of the rule. See also Gulbankian, 196 N.W.2d at 732 (explaining that "[i]t is no defense that the will represents the

wishes of the testatrix" and recognizing that "longstanding friendship and confidential relationship between a client and an attorney" can raise specter of undue influence in public's eye and "[a]n attorney must be as careful to avoid the appearance of evil as he is to avoid evil itself."). Simply put, "[p]reparation of a will [or deed] in which the lawyer will be a beneficiary is conduct for which a lawyer will be disciplined." In re Polevoy, 980 P.2d 985, 987 (Colo. 1999) (en banc); see also Att'y Grievance Comm'n of Md. v. Stein, 819 A.2d 372, 379 (Md. 2003) (suspending attorney who drafted instrument in which he was named as beneficiary, finding such conduct "undermines the public confidence in the legal profession in a particularly egregious manner" and citing cases where other courts have imposed suspensions for similar violations). The record supports the panel's conclusions that respondent violated Rules 1.7 and 1.8(c).

## B. Appropriate Sanction

¶ 40. We thus turn to the appropriate sanction and in doing so, "we consider: (a) the duty violated; (b) the lawyer's mental state; and (c) the actual or potential injury caused by the lawyer's misconduct; and (d) the existence of aggravating or mitigating factors." Wysolmerski, 2020 VT 54, ¶ 27 (quotation omitted). In conducting our analysis, we are mindful that "the purpose of sanctions is not to punish attorneys, but rather to protect the public from harm and to maintain confidence in our legal institutions by deterring future misconduct." Id. (quotation omitted).

¶ 41. As indicated above, the panel found that respondent violated a duty of loyalty to L.Z.; he acted knowingly; and his conduct caused serious actual and potential harm, somewhat tempered by respondent's treatment of L.Z.'s home.

¶ 42. The record supports a conclusion that respondent violated a duty of loyalty to his client and that he acted knowingly, that is, "[w]ith conscious awareness of the nature or attendant circumstances of his or her conduct both without the conscious objective or purpose to accomplish a particular result." ABA Standards, Part II, Theoretical Framework, at 6; cf. id. (defining most culpable mental state, "intent," as "when the lawyer acts with the conscious objective or purpose

14

to accomplish a particular result"). As the panel found, respondent drafted the documents in question, and he sent another attorney to deliver the documents and witness their execution; respondent testified that he advised L.Z. to designate someone else under the will and deed and to consult with another lawyer but that she rejected that advice. The panel did not find that respondent acted with the intent to benefit himself and thus rejected disbarment as a presumptive sanction. See ABA Standard § 4.31(a). "Because the line between mental states is difficult to discern and involves factual determinations, we give deference to the panel's assessment of an attorney's mental state." Bowen, 2021 VT 7, ¶ 33 (quotation omitted); see also In re Stepovich, 386 P.3d 1205, 1209-10 (Alaska 2016) (concluding under similar circumstances that attorney acted knowingly).

¶ 43. The panel rejected respondent's assertion that he acted negligently, and we find no basis to disturb that conclusion. As the panel explained, moreover, there was a substantial amount of evidence presented to suggest that respondent was in fact soliciting a gift from L.Z., even though it did not rise to the level of clear and convincing evidence. There was no written trust agreement, informed consent, or memorialization of an oral trust, which cast additional doubt on respondent's assertion that he believed he was acting pursuant to a trust agreement rather than receiving gifts from L.Z. through the legal instruments he drafted. Respondent's challenge to the panel's evaluation of the weight of the evidence is unavailing.

¶ 44. Turning to injury, the panel found that respondent's conduct caused actual harm to L.Z. because she was deprived of independent advice, "which in turn raises questions of undue influence" and the validity of the legal documents in question. Stepovich, 386 P.3d at 1210. Citing Stepovich, the panel cited a number of problematic consequences that typically flow from such misconduct, including "the attorney's incompetency to testify, . . . the attorney's ability to influence the testator, . . . jeopardy to probate of the entire will if its admission is contested, . . . harm to other beneficiaries, and the undermining of the public trust and confidence

15

in the legal profession." Id. at 1210-11 (quotation omitted). "Once deceased, of course, the client will have no opportunity to protect himself from the attorney's negligent or infamous conduct." Id. at 1211 (quotation omitted).

¶ 45. The panel found actual harm and potential harm along these lines. It explained that the documents that respondent drafted could conceivably be challenged by one or more heirs. L.Z. could no longer take issue with respondent's claim of a trust agreement or contest the distribution respondent proposed to make. L.Z.'s heirs have no way to determine with confidence that L.Z. was not the subject of undue influence, and they have no way of knowing if respondent's identification of intended beneficiaries and proposed formula of distribution, which deviated significantly from L.Z.'s 2011 will, reflected L.Z.'s actual intent. Finally, in the absence of any written memorialization of the trust agreement, the intended beneficiaries (whoever they might be) might have been deprived of their inheritance if respondent died before the various inquiries caused him to declare that he was administering a trust. In sum, the panel found that respondent's conduct caused serious harm to L.Z., L.Z.'s potential beneficiaries, and the legal profession. As noted, the panel found this harm somewhat tempered by respondent's treatment of respondent's home and the fact that he eventually disclaimed any interest in L.Z.'s property.

¶ 46. The record supports the finding that respondent's behavior caused serious harm to L.Z. and to others as outlined above. His behavior regarding L.Z.'s home can be equally viewed as serving his own self-interest rather than as mitigating harm, although he has since disclaimed any interest in retaining the funds from the sale of the home. Respondent offers no persuasive argument to the contrary regarding the harm caused by his misconduct. He attempts to blame L.Z. for his actions and argues that oral trusts are inherently uncertain even if one had been created by independent counsel. Again, respondent simply relies on his own version of the evidence and ignores the findings and conclusions made by the panel.

16

¶ 47.   We agree with the panel that ABA Standard § 4.3, which governs "Failure to Avoid Conflicts of Interest," applies.   ABA Standard § 4.32 provides that "[s]uspension is generally appropriate when a lawyer knows of a conflict of interest and does not fully disclose to a client the possible effect of that conflict, and causes injury or potential injury to a client."   A suspension is the appropriate presumptive standard here given the finding that respondent acted knowingly.

¶ 48.   "After misconduct has been established, aggravating and mitigating circumstances may be considered in deciding what sanction to impose."  Id. § 9.1.  The panel cited as aggravating factors: respondent's refusal to acknowledge the wrongful nature of his conduct; the victim's vulnerability; and respondent's substantial experience in the practice of law.  As mitigating factors, it cited the absence of a prior disciplinary record and respondent's cooperative attitude during the investigative process and disciplinary proceeding.   It concluded that the aggravating factors slightly outnumbered the mitigating factors and merited considerable weight.   It also gave significant mitigating weight to the absence of a prior disciplinary record and respondent's longstanding volunteer work in his community.  On balance, the panel concluded that the factors did not warrant modification of the presumptive sanction.

¶ 49.   We agree with the panel's identification of these factors but recognize, as an additional aggravating factor, multiple offenses.  On balance, we agree that the factors do not justify a modification of the presumptive sanction, even with the additional aggravating factor, given that respondent acted knowingly rather than with intent.  Disbarment is the presumptive sanction when an attorney acts with intent to benefit himself, and the panel did not find such intent here.   Respondent's assertion that he was not blaming the victim, that the victim was not vulnerable, and that he lacked a "dishonest or selfish motive," all challenge the panel's assessment of the weight of the evidence; these arguments are unavailing here.

¶ 50.   The ABA Standards state that suspensions should generally "be for a period of time equal to or greater than six months," Id. § 2.3, although that statement is not binding on the panel

or this Court. See In re McCarty, 164 Vt. 604, 605, 665 A.2d 885, 887 (1995) (mem.) (recognizing that "periods of suspension of less than six months are appropriate in some circumstances"). "The rationale is that short-term suspensions with automatic reinstatement are not an effective means of protecting the public because rehabilitation cannot be shown in less than six months and a six-month duration is needed to protect client interests." In re Blais, 174 Vt. 628, 631, 817 A.2d 1266, 1270 (2002) (mem.) (quotation omitted.). A lawyer who is suspended for six months or more must apply for reinstatement and make the specific showing outlined in the rule to be readmitted. See A.O. 9, Rule 26(B), (D). While we consider respondent's misconduct serious and worthy of censure, we conclude that, under all of the circumstances, a five-month suspension is appropriate here. We conclude that the public will be adequately protected without requiring respondent to reapply for admission as would be necessary with a suspension of six months.

¶ 51. Like Bowen, the violations here involved a lawyer's "most important ethical duties, [which] are those obligations which a lawyer owes to clients." Bowen, 2021 VT 7, ¶ 30 (quotation omitted). An attorney has a duty "to represent the client with undivided loyalty," which forms part of "the foundation of the attorney-client relationship." 2 R. Mallen, Legal Malpractice § 15:1 (2022 ed.). As in Bowen, the violations here go to the heart of the attorney-client relationship and "[i]n straying from these fundamental obligations, an attorney risks eroding public trust in the profession as a whole—a trust without which our legal system cannot function." Bowen, 2021 VT 7, ¶ 30; see also 2 Mallen, supra, § 15:1 (explaining that "[w]hen the public perceives that the legal profession fulfills its fiduciary obligations, future clients are more likely to commit their trust and confidences to a lawyer" and "[a] fundamental predicate to that public perception is for lawyers to avoid even the appearance of impropriety").

¶ 52. In Bowen, the respondent violated two conflict-of-interest rules: Rule 1.8(b) (providing that, with limited exception, lawyer cannot use information relating to representation of a client to the client's disadvantage) and Rule 1.9(c)(2) (providing that lawyer cannot, with

18

narrow exceptions, reveal information relating to representation of former client). Essentially, the respondent threatened to interfere with his current client's imminent real-estate closing in pursuit of his own self-interest in obtaining payment from one of the parties (a former client) for an unpaid bill. At the eleventh hour, the former client agreed to pay one-half of the asserted bill, and the real-estate transaction closed.

¶ 53. We upheld the rule violations and agreed that the respondent acted knowingly, caused actual harm to his former client and his client in the real estate transaction, and placed the current client at risk of an even greater potential injury in the form of the collapse of the real estate sale. We applied ABA Standard § 4.3 and found it significant that the matter involved duties owed to clients as these are considered a lawyer's "most important ethical duties." Bowen, 2021 VT 7, ¶ 30 (quotation omitted). The respondent there acted with "dishonest or selfish motive," he had substantial experience in the practice of law, he refused to acknowledge the wrongful nature of his conduct, and he had multiple offenses. Id. ¶ 43 (quotation omitted). As mitigation, he had no prior disciplinary history, and he was cooperative during the disciplinary proceedings. We concluded, under these circumstances, that a three-month suspension was necessary "to maintain public confidence in our legal institutions." Id. ¶ 50.

¶ 54. The rule violations here are more egregious, and the harm is more significant, to the client, to the prospective beneficiaries, and to "the public trust in the profession as a whole." Id.; see also In re Mattson, 2002 S.D. 112, ¶ 40 (recognizing that "preservation of trust in the legal profession is essential"). As recited above, the will and ELE deed could conceivably be challenged; L.Z. can longer contest respondent's version of events; the heirs have no way to know if the documents were the product of undue influence or if they accurately reflect L.Z.'s wishes; and given the absence of any memorialization of the alleged agreement, there was a risk that, if respondent died, the intended beneficiaries would have been deprived of an inheritance as L.Z.'s assets would have passed to respondent's heirs. See Stepovich, 386 P.3d at 1210-11 (identifying

19

dangers in these types of transactions); see also Polevoy, 980 P.2d at 987 (similarly recognizing that there are many reasons for prohibiting attorneys from preparing instruments that benefit the attorney, including "conflict of interests, the incompetency of an attorney-beneficiary to testify . . . , the possible jeopardy of the will . . . , the possible harm done to other beneficiaries and the undermining of the public trust and confidence in the integrity of the legal profession"). These harms are more numerous and more serious than those at issue in Bowen.

¶ 55. As referenced above, "[t]rust and confidence form the foundation of the attorney-client relationship," In re Bowen, 2021 VT 7, ¶ 50, and "[s]eldom is the client's dependence upon, and trust in, his attorney greater than when, contemplating his own mortality, he seeks the attorney's advice, guidance, and drafting skill in the preparation of a will to dispose of his estate after death," Stein, 819 A.2d at 376. The Stein court explains,

> These consultations are often among the most private to take place between an attorney and his client. The client is dealing with his innermost thoughts and feelings, which he may not wish to share with his spouse, children and other next of kin.
>
> Because the decisions that go into the preparation of a will are so inherently private, and because, by definition, the testator will not be available after his death, when the will is offered for probate, to correct any errors that the attorney may have made, whether they are negligent errors or of a more sinister kind, a client is unusually dependent upon his attorney's professional advice and skill when he consults the attorney to have a will drawn. The client will have no opportunity to protect himself from the attorney's negligent or infamous misconduct.

819 A.2d at 376 (quotation omitted) (also recognizing that "client's dependence upon, and trust in, his attorney's skill, disinterested advice, and ethical conduct exceeds the trust and confidence found in most fiduciary relationships"); see also Mattson, 2002 S.D. 112, ¶ 44 (recognizing that attorney-client relationship is "highly fiduciary" and "requires the highest degree of fidelity and good faith"). That was particularly true here as the client was elderly and in declining health and

needed to move into a nursing home; she trusted and relied on respondent to give her truly independent advice.

¶ 56. The rules expressly prohibit the conduct here in recognition of these harms, and violations of this rule are considered "most serious." Stein, 819 A.2d at 376. Respondent's "failure to have the [will and deed] drafted by uninvolved counsel not only deprived [L.Z.] of an independent point of view but also exposed her to the inherent conflict of interest the rule is designed to eliminate." Gillingham, 896 P.2d at 663. A client can never consent to such a transaction because it "is inherently permeated with the dangers of self-dealing and undue influence." Id.; see id. at 663-64 (recognizing that "[u]nlike the other rules governing conflicts of interest, the prohibition on testamentary gifts which are drafted by the lawyer-beneficiary does not include an exception when the client gives informed consent").

¶ 57. Unlike the instant case, the lawyer in Gillingham acknowledged the wrongful nature of his conduct. The Gillingham court viewed the lawyer's actions "with extreme censure," explaining that the practice "casts a pall of potential self-dealing and undue influence." Id. at 665. Based on different aggravating and mitigating circumstances than those present here, it ultimately deemed a sixty-day suspension appropriate "[g]iven the seriousness of the misconduct, the clarity and force with which this court and the [Rules of Professional Conduct] proscribe it, and [the lawyer's] prior disciplinary history of one admonition." Id. We are struck by the fact that in the instant case, respondent continues to believe that he did nothing wrong.

¶ 58. "[T]he purpose of sanctions is not to punish attorneys, but rather to protect the public from harm and to maintain confidence in our legal institutions by deterring future misconduct." Wysolmerski, 2020 VT 54, ¶ 27 (quotation omitted); see also Stein, 819 A.2d at 375 (similarly recognizing that discipline is imposed "not to punish the lawyer but rather to protect the public and the public's confidence in the legal profession," and it is also "aimed at deterring other lawyers from engaging in similar conduct"). "[T]he public is protected when sanctions are

21

imposed that are commensurate with the nature and gravity of the violations and the intent with which they were committed." Stein, 819 A.2d at 375. "The appropriate sanction must be weighty enough to counter [the] serious risk[s]" presented by such conduct. Bowen, 2021 VT 7, ¶ 50.

¶ 59. Like the Gillingham court, we recognize the serious harms posed by these types of violations and we view the conduct here "with extreme censure." 896 P.2d at 665. Attorneys and members of the public must know that this type of behavior will not be tolerated. We conclude that a five-month suspension is appropriate here given the serious harm that resulted from the misconduct, the vulnerability of the victim, the lack of remorse, and the nature of the violations, particularly the violation of a clear prohibition on drafting documents gifting client property to oneself. Not only did respondent's misconduct harm his client by depriving her of independent advice but it harmed L.Z.'s relatives, who will never know with confidence what L.Z. intended; all of this, in turn, harms the public's confidence in the legal profession. A lengthy period of suspension is required.

Respondent is suspended from the practice of law for five months. He completed a three-month suspension during the pendency of this appeal; the remaining two-month suspension will begin fourteen days after the mandate issues in this case. Respondent is directed to comply with the requirements of A.O. 9, Rule 27.

BY THE COURT:

_____
Paul L. Reiber, Chief Justice


_____
Harold E. Eaton, Jr., Associate Justice


_____
Karen R. Carroll, Associate Justice


_____
William D. Cohen, Associate Justice


_____
Nancy J. Waples, Superior Judge,
Specially Assigned

22