NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2023 VT 45

No. 22-AP-265

In re C. Robert Manby, Jr., Esq.     Original Jurisdiction
(Office of Disciplinary Counsel)
             Professional Responsibility Board

             April Term, 2023

Hearing Panel
James A. Valente, Esq., Chair
Amelia W.L. Darrow, Esq., Member
Brian Bannon, Public Member

Edward G. Adrian of Monaghan Safar Ducham PLLC, Special Disciplinary Counsel,
 Burlington, for Appellant.[1]

Harry R. Ryan of Facey Goss & McPhee P.C., Rutland, for Appellee.

PRESENT: Eaton, Carroll, Cohen and Waples, JJ., and Tomasi, Supr. J., Specially Assigned

¶ 1. **PER CURIAM.** In this case, a Professional Responsibility Board (PRB) hearing panel determined that respondent violated three ethical rules in handling certain estate planning matters on behalf of an elderly client. It imposed a five-month suspension as a sanction. The Court ordered review of this decision on its own motion. We agree with the panel that respondent violated the rules in question but conclude that a one-year suspension is appropriate given the totality of circumstances.

---

[1] Attorney Sarah Katz was Disciplinary Counsel until December 30, 2022, when she vacated that position. She represented the Office of Disciplinary Counsel throughout the proceedings below and filed the appellant's brief in this Court. Special Disciplinary Counsel Edward G. Adrian was substituted as counsel for appellant following Attorney Katz's departure.

## I. Background

### A. Procedural History

¶ 2. In August 2020, Disciplinary Counsel filed a petition of misconduct, alleging that respondent had violated Rules 1.1, 1.4(b), and 1.14(a) of the Vermont Rules of Professional Conduct. Respondent filed an answer to the petition, including admissions or denials to the alleged violations and averments of fact. He denied violating Rule 1.14(a) (Count 1) but admitted to violating Rules 1.1 (Count 2) and 1.4(b) (Count 3). Respondent specifically stated that he "negligently" violated Rules 1.1 and 1.4(b), even though Disciplinary Counsel's allegations did not mention respondent's state of mind.

¶ 3. Respondent subsequently moved to narrow the scope of issues. Respondent argued that because he filed an answer admitting to negligently violating Rules 1.1 and 1.4(b), i.e., Counts 2 and 3 of the petition, the panel was bound to accept his admissions as facts and should immediately rule that Disciplinary Counsel's burden was satisfied as to Counts 2 and 3 and that no further discovery or evidence was necessary for those counts except regarding the issue of sanctions. He thus requested that the panel limit the scope of discovery to Count 1—the alleged violation of Rule 1.14(a)—and the appropriate sanctions for Counts 2 and 3. Disciplinary Counsel did not oppose this motion.

¶ 4. The panel denied the motion. It reasoned that a respondent's admissions to allegations in the petition are not necessarily dispositive and that Administrative Order 9 does not allow the parties to stipulate to legal conclusions—for example, that a violation of the Rules of Professional Conduct has occurred. It explained that the panel has an independent duty in every case to determine whether the evidence presented at the hearing proves the violations alleged in the petition. The panel declined to restrict the scope of discovery, leaving it to the parties to confer and agree upon any limitations.

## B. Hearing Panel Decision

¶ 5.    The panel held a two-day merits hearing in October 2021.  In October 2022, following post-hearing briefing, motion practice, and delays due to issues not relevant to this appeal, the panel issued an order including findings of fact, conclusions of law, and sanctions.

### 1. Findings

¶ 6.    The panel made the following findings.  Respondent has been licensed in Vermont since 1980.  He has a solo practice in White River Junction focused on real property and probate matters.  In February 2015, respondent was contacted by J.M., who respondent had represented in real estate matters twenty to thirty years earlier.  J.M. told respondent he was helping his elderly mother, E.M., transfer title to her home and wanted to avoid probate.  Respondent knew that at the time, E.M. was ninety-one years old and living in her own home in Burlington with J.M. Respondent also knew that E.M.'s two daughters visited her regularly.  Without communicating directly with E.M., respondent agreed to represent her and prepare documents transferring her home to a joint tenancy with right of survivorship to J.M., despite knowing that such a transfer might affect E.M.'s eligibility for Medicaid.  Respondent never discussed this issue with E.M. and relied on representations by J.M. as to E.M.'s wishes.  He prepared a deed and sent it to J.M. only.

¶ 7.    In June 2015, at J.M.'s request, respondent drove from White River Junction to Burlington and met E.M. and J.M. in a supermarket parking lot off the highway to notarize the deed that respondent had mailed to J.M., purportedly because there was no convenient way to have the document notarized in Burlington.  This was the first time respondent met or spoke with E.M. Respondent got into the car with J.M. and E.M. and rode with them to the parking lot of E.M.'s church nearby.  Respondent then got out of the car and crouched down near the passenger side of the car where E.M. was sitting.  E.M. was elderly, physically feeble to the point of being unable to turn or twist to face respondent, and hard-of-hearing.  Respondent provided E.M. with a brief explanation of what the deed did and asked if she wished to convey her home to J.M. and herself

3

jointly. E.M. said "yes." J.M. was in the car for most of this conversation. Respondent notarized E.M.'s signature on the deed after she again said "yes" when asked if it was her free act and deed. Respondent did not recall that E.M. said anything other than "yes" during this encounter. He did not recall discussing other estate planning options with E.M. or explaining the advantages or disadvantages of the transfer. He did not discuss with her the possible waiver of attorney-client privilege that might occur when confidential matters were discussed in J.M.'s presence. In short, the panel explained, respondent never met with or spoke to E.M. alone. He never engaged her in conversation or asked her questions to which more than a single word response of "yes" was required. He did not make even basic inquiry, such as asking her the names of her children, her health status, or asking her to summarize the nature and extent of her assets.

¶ 8. During this parking-lot meeting, J.M. produced two other documents that respondent had never seen. The first gave J.M. ownership of an account belonging to E.M. that contained approximately $14,000; the second established or modified a trust to make J.M. the beneficiary of E.M.'s major assets. With J.M. sitting in the car next to E.M. for most of the time, respondent notarized these two additional documents, attesting that E.M. understood the paperwork and that she was signing as her free act and deed.

¶ 9. Respondent had a second meeting with E.M. in late September 2015. Respondent had not spoken to E.M., attempted to communicate with her, or interacted with her in any way since their previous meeting in June 2015. By contrast, during that period respondent spoke regularly to J.M., who called him often. J.M. told respondent that E.M. had changed her mind and now wanted to convey her home solely to him and also wanted him to have greater control over any remaining assets. Respondent was surprised to learn that J.M. had not recorded the prior deed. Acting on J.M.'s instructions and without contacting E.M., respondent prepared a new deed and power of attorney. The parties again met in J.M.'s car, this time in a White River Junction parking lot. J.M. was present during the entire meeting, sitting next to E.M. Respondent did not ask E.M.

if she understood the documents; he simply "explained what the document[s] did." Respondent thought E.M. recognized him from the prior meeting because she smiled at him, but he did not ask E.M. if she remembered him. Again, respondent did not discuss with E.M. the possible adverse consequences, for Medicaid purposes, of transferring her property to J.M. Nor did he ask her about her long-term care plans or discuss alternatives to the transfer in question. Respondent followed J.M.'s instructions because J.M. was "insistent" that title to the house be transferred immediately, despite the potential adverse consequences for E.M.

¶ 10. Respondent did not communicate with E.M. further until February 2016, when J.M. drove E.M. to White River Junction to have respondent witness an Advanced Health Care Directive. Respondent did not meet with E.M. privately or ask why she needed a ride to White River Junction just to get a document witnessed.

¶ 11. Shortly thereafter, J.M. called respondent asking about how to revoke a power of attorney. In late March 2016, J.M. came to respondent's office with E.M. and asked him to notarize a document respondent had never seen. This document revoked E.M.'s 2009 durable power of attorney, which had appointed one of her daughters as her agent. E.M. said "yes" when respondent asked if this was her wish. J.M. was present throughout the meeting. Respondent did not engage in any conversation with E.M. to see if she understood how this series of documents had changed her estate plan and he did not obtain or review a copy of her prior estate-planning documents with her. This was respondent's last meeting with E.M.

¶ 12. Respondent sent three invoices in total for his work. The first two, in March and May of 2015, were addressed to J.M. The third invoice was directed to E.M. At some point during respondent's representation of E.M., J.M. provided respondent with an envelope that contained $1000 in cash, which J.M. said was a gift. Respondent kept the money and did not credit it to E.M.'s account.

¶ 13.    Around the time of respondent's final meeting with E.M., J.M. attempted to bar his sisters from visiting E.M.  His sisters obtained an emergency temporary guardianship order and, through representation by counsel, successfully obtained orders in the probate division invalidating the various documents that respondent had prepared and notarized at J.M.'s direction.

¶ 14.    Several witnesses testified as to E.M.'s mental and physical health before the PRB hearing panel, including Dr. Gunther, E.M.'s longtime primary care physician, and Dr. Nash, the forensic psychologist who evaluated E.M.'s competency for the emergency guardianship proceedings.  Dr. Gunther met with E.M. several times during 2015 to 2016, including within one month of each of respondent's meetings with her.  Dr. Nash evaluated E.M. in May 2016.  Based on the doctors' testimony and that of several lay witnesses, the panel found as follows.  E.M. suffered from Alzheimer's disease as early as 2009 and dementia as early as 2008.  Her cognitive abilities continued to decline from then until her death in 2017.  E.M. had almost no ability to care for herself during the 2015-to-2016 period while respondent was representing her.  She could not read books, write letters, or otherwise communicate.  She would say "yes or no" but her answers were not clearly related to the questions asked.  She often spoke in "word salad," where she would mumble various nonsensical and unrelated words.  Although on some days E.M. would be more awake or alert, her cognitive abilities never improved, and even on "good" days she could not recall her children's names and did not recognize them.  During this period, her loss of mental functioning was so profound that her significant impairment would be obvious after spending five minutes with her.  By May 2016, E.M. was in the final stage of dementia and she was not oriented to person, place, or time.  Respondent conceded that E.M. was incompetent by May 2016.  The panel found that E.M. was incompetent during each of respondent's meetings with her in 2015 and 2016, and would not have been able to even minimally understand the legal documents she signed or the consequences thereof.

## 2. Conclusions

¶ 15. The panel concluded by clear and convincing evidence that respondent violated all three rules charged. It first analyzed Vermont Rule of Professional Conduct 1.14(a), which provides that "[w]hen a client's capacity to make adequately considered decisions in connection with a representation is diminished, whether because of minority, mental impairment or for some other reason, the lawyer shall, as far as reasonably possible, maintain a normal client-lawyer relationship with the client."

¶ 16. The panel determined that respondent was obligated to at least attempt to assess his client's competence in a reasonable way. It concluded that his only attempt to do so—looking at E.M. and concluding that she recognized him based on her facial expression without asking her whether she did—was insufficient. It explained that there were many "red flags" regarding competency that respondent was aware of, including that he: never met with E.M. alone; relied on assurances from J.M. that she was competent yet he knew J.M. was the sole beneficiary of the proposed changes; took directions solely from J.M. and did not verify in any way that E.M. understood J.M.'s directions; never received more than a single-word response ("yes") from E.M. to his questions; changed E.M.'s estate plan to her apparent disadvantage but never asked E.M. why she would want to take this step; did not question why J.M. would drive his frail mother across the state just to get a signature witnessed or a document notarized; met E.M. and J.M. in a parking lot only a few blocks from E.M.'s home; and accepted a cash gift from J.M. even though no legal fees were due.

¶ 17. The panel decided that if respondent truly did not recognize that E.M. was incompetent during their meetings, he should have. He failed to ask a single open-ended question that required more than a one-word answer. He never asked E.M. what she wanted to accomplish, which was central to his representation of her.

7

¶ 18.  The panel rejected respondent's assertion that Disciplinary Counsel was required to prove that an expert had seen E.M. on the dates that she met with respondent to sign documents and found her to be incompetent on those dates.  It reasoned that this standard would make it virtually impossible to prove rule violations because it was highly unlikely that a qualified witness could testify as to a client's condition on the exact day they met with counsel.  The panel deemed it sufficient instead for Disciplinary Counsel to offer evidence, as was presented here, that the client's "ceiling" would not allow them to understand the lawyer or the gravity of major changes to their estate plan advocated by those who stood to benefit from the changes, and that the client's condition would have been obvious to a lawyer making minimal basic inquiries as to the client's desires, medical history, and assets.  The panel noted that a lawyer handling an estate plan would ordinarily discuss with a client the natural objects of their bounty and the nature and extent of their estate.  Respondent did none of this.  Had he even inquired as to the name of E.M.'s children, he would have discovered her cognitive impairment.  Thus, the panel concluded that respondent violated Rule 1.14(a) because he failed to make a reasonable effort to assess E.M.'s cognitive abilities, which would have revealed her obvious diminished capacity, and he failed to maintain a normal client-lawyer relationship with E.M. despite her diminished capacity.

¶ 19.  The panel next analyzed Rule 1.1, which provides: "A lawyer shall provide competent representation to a client.  Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation."  It concluded that respondent violated this rule by failing to use methods and procedures meeting the standards of competent practitioners, such as meeting with and giving E.M. an opportunity to privately consult with him; determining what her wishes were and ensuring that the proposed plan served her wishes; and discussing long-term care considerations given her age and frail health.

¶ 20.  Finally, the panel discussed Rule 1.4(b), which states that "[a] lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions

8

regarding the representation." It concluded that respondent violated Rule 1.4(b) because he communicated almost exclusively with a third party rather than the client, and E.M. did not engage intelligently in any decision about her estate plan. It rejected respondent's argument that it was sufficient, under the circumstances, for him to explain each document to E.M. and receive an affirmative response that each document was what she wanted. The panel explained that if respondent had tried to determine whether E.M. understood what he was saying, he would have quickly discovered that she was not able to make life-care decisions.

¶ 21. As to sanctions, the panel considered the nature of the duties violated, respondent's mental state, the harm caused by respondent's misconduct, and aggravating and mitigating factors. The panel concluded that respondent violated the most basic duties owed to his client and did so knowingly. It reasoned that respondent acted with a knowing mental state because he consciously prepared documents to transfer E.M.'s assets, even though he did not intend to benefit J.M. at E.M.'s expense. If respondent's representation had ended after drafting the first deed, the panel acknowledged that it might have concluded that respondent was merely negligent. However, because respondent continued to represent E.M. for many months and had considerable time to contemplate the multiple transactions and communicate with E.M., the panel concluded that his conduct rose beyond negligence to the level of knowing.

¶ 22. The panel also concluded that respondent's conduct caused actual injury. E.M.'s daughters were required to hire an attorney, pursue an emergency guardianship, then retain another attorney to pursue an action against respondent for malpractice. Respondent's actions tied the family up in litigation for more than five years. The panel found this enormously damaging with possibly permanent consequences. It rejected respondent's argument that because the family was apparently ultimately successful in recovering their economic losses through litigation, this meant there was no injury. To the contrary, the panel determined that this showed there were actual injuries, both economic and personal, caused by respondent's misconduct.

9

¶ 23.    Based on applicable American Bar Association (ABA) Standards, the panel noted that the presumptive sanction was a suspension.  The panel cited as aggravating factors: a pattern of misconduct that occurred over more than a year; respondent's failure to acknowledge the wrongful nature of his conduct; a particularly vulnerable client; and respondent's substantial experience in the practice of law and in this area particularly.  It also considered mitigating factors, including that respondent: had no prior disciplinary record; had no dishonest or selfish motive, though the $1000 gift was troubling; and cooperated with Disciplinary Counsel.  The panel looked to recent case law and determined that a five-month suspension was appropriate.

## II.  Supreme Court Review

¶ 24.    "On appeal, we will uphold the hearing panel's factual findings unless they are clearly erroneous, meaning that there is no credible evidence to support them."  In re Kulig, 2022 VT 33, ¶ 30, 216 Vt. 514, 282 A.3d 926 (quotation omitted).  However, we review de novo the panel's legal conclusions, including its violation determinations and sanction recommendations. In re Robinson, 2019 VT 8, ¶ 27, 209 Vt. 557, 209 A.3d 570.  This Court has "disciplinary authority concerning all judicial officers and attorneys at law in the State." Vt. Const. ch. II, § 30.  "Because we bear ultimate responsibility for the discipline of Vermont attorneys, we impose without deference the sanction we find most appropriate."  Kulig, 2022 VT 33, ¶ 30 (quotation and alterations omitted).

### A.  Due Process

¶ 25.    Respondent argues that, for each of the three rule violations, he had insufficient notice of the charges against him because the panel's findings and conclusions do not match the allegations in the petition for misconduct.  He contends that he was thereby deprived of due process.  It appears that respondent raises these arguments for the first time on appeal.  See Bull v. Pinkham Eng'g Assocs., Inc., 170 Vt. 450, 459, 752 A.2d 26, 33 (2000) ("Contentions not raised or fairly presented to the [tribunal below] are not preserved for appeal.").  However, respondent's

10

claim—that he was found to have violated ethical rules and had his professional license suspended based on conduct he was never charged with—implicates substantial rights and, if true, would constitute a "miscarriage of justice." See Deyo v. Kinley, 152 Vt. 196, 201, 565 A.2d 1286, 1289 (1989) (recognizing that "even where an issue is not preserved, we can reverse in exceptional cases where there is plain error that affects substantial rights of the party" and "result[s] in a miscarriage of justice" (quotation omitted)). As such, we exercise our discretion to address the merits of these arguments. We discuss each violation in turn below.

### 1. Rule 1.14(a)

¶ 26. We agree with respondent that "an attorney charged with misconduct is entitled to basic procedural due process rights, including the right to fair notice of charges. Thus, findings concerning uncharged behavior cannot be used to support a conclusion of misconduct." In re Berk, 157 Vt. 524, 528, 602 A.2d 946, 948 (1991) (per curiam) (citation omitted). However, we disagree that the panel violated this principle here.

¶ 27. The petition of misconduct alleged that respondent violated Rule 1.14(a) when he "failed to maintain a normal client-lawyer relationship with 91-year-old client EM who was a client with diminished capacity; to wit: accepted client EM's son's representations about EM's wishes without inquiring with EM directly or consulting with her about her own wishes, objectives, and concerns." Contrary to respondent's contention, the panel did not conclude that he violated Rule 1.14(a) because "he did not apply some unspecified standard to determine his client's mental capacity." Far from holding respondent to some unspecified or uncharged standard, the panel determined that it "need not consider how specifically a lawyer should go about assessing client competency when no attempt was made here." Consistent with the charges, the panel determined that E.M. lacked capacity during all of respondent's meetings with her and that, despite this obvious impairment, respondent failed to make even a minimal attempt to maintain a normal attorney-client relationship with her. Mirroring the petition of misconduct, the panel found that

11

respondent "made no effort to engage his client in any conversation, or talk to other family members" besides J.M., "who quite obviously had a vested interest in having his mother's estate plan changed." It found further that respondent "rel[ied] entirely on [J.M.'s] directions and representations" and there was no evidence that "EM ever told Respondent what she wanted to do with her property, or the reasons therefor." The panel's findings closely track Disciplinary Counsel's allegations, so we see no due process violation.

## 2. Rule 1.1

¶ 28. Respondent argues that the panel violated his due process with respect to Rule 1.1 because "[a]lthough charged with a failure to adequately discuss EM's estate planning, the Panel found him guilty of misconduct for failing to make an effort to assess EM's cognitive abilities." Respondent misunderstands the relevant allegations and corresponding portions of the panel's decision. Disciplinary Counsel alleged that respondent "failed to provide competent representation to EM; to wit: failed to meet with her privately and discuss with her what her objectives and concerns were in arranging her estate and failed to advise her of possible consequences of property transfers to [J.M.]." Respondent contended to the panel that his face-to-face meeting with E.M. and J.M. in the parking lot was "private enough" because J.M. did not interfere and E.M.'s back was to J.M. The panel rejected this argument as "overlook[ing] [r]espondent's essential duty to his client." It explained that respondent "had a duty to determine that the estate plan he was crafting reflected EM's wishes." He violated this duty because he "did not even attempt to determine if he was making changes that his client in fact wanted"; "he did not engage EM in conversation or get her to talk beyond one[-]word answers." All of these findings mirror Disciplinary Counsel's allegations. And contrary to respondent's assertion, the panel stated that "it is not necessary to establish" whether E.M. had capacity to conclude that respondent incompetently represented her in violation of Rule 1.1. Nevertheless, its findings about E.M.'s significant cognitive decline during the period of respondent's representation—which were well-

12

supported by record evidence—made the violation more severe and troubling given respondent's willful ignorance of suspicious circumstances and behavioral red flags. The panel did not run afoul of due process by mentioning issues regarding E.M.'s competency in conjunction with this ethical violation. The evidence supported the panel's findings, which in turn supported a violation of Rule 1.1 and tracked the petition of misconduct. We reject respondent's due-process argument.

### 3. Rule 1.4(b)

¶ 29.　As with the other two rules, respondent argues that the panel violated his due process rights by concluding that he violated Rule 1.4(b) based on uncharged conduct, namely, failing to apprehend that his client was mentally impaired. Again, respondent's argument is founded on an overly narrow view of the petition of misconduct and the panel's decision. Disciplinary Counsel alleged that respondent violated Rule 1.4(b) when he "failed to adequately communicate with his client EM; to wit: drafted and/or presented to EM for signature multiple documents affecting EM's interest in her own assets without explaining the documents to her or the possible consequences to the extent reasonably necessary to permit her to make informed decisions."

¶ 30.　The panel's relevant findings and conclusions match these allegations. It determined that respondent violated his duty of communication to E.M. because he "failed to explain the documents he had his client sign so that she could make an informed decision" and "continued to take directions solely from [J.M.]" Thus, the panel did not rely on uncharged conduct. Contrary to respondent's contention, the panel did not conclude that he violated Rule 1.4(b) because E.M. was cognitively impaired or because of his failure to discover that impairment. Instead, the panel's findings about E.M.'s cognitive limitations illuminated the shocking extent of respondent's failure to communicate with her. As it explained, had he attempted to engage with her beyond a couple of yes-or-no questions regarding documents already prepared at J.M.'s direction, "he would have quickly known that she was not able to make life care decisions" and

13

this would have "encouraged Respondent to explore other issues, such as long term care options for EM, or the role that all three of her children might play in EM's future care." In our view, respondent's conduct would have fallen short of the Rule 1.4(b) standard for any client, but the violation was particularly egregious here because even the barest attempt to comply with Rule 1.4(b) would have revealed E.M.'s inability to make informed decisions about her estate planning, prompting the need for respondent to take even greater steps than with an unimpaired client to protect her and ensure that his communications and representation met her needs. The panel's recognition of these circumstances did not amount to adjudicating a violation based on uncharged conduct.

### B. Lawyer's Assessment of Client's Capacity

¶ 31. Respondent argues that the Vermont Rules of Professional Conduct impose no requirement to assess a client's capacity and that the panel improperly established and held him to such a standard. He asserts that even if such a duty exists, he satisfied it. As a threshold matter, we explained above that the violations of Rules 1.1 and 1.4(b) were not founded on E.M.'s incapacity or respondent's failure to recognize her incapacity. We hold that Rule 1.14(a) requires attorneys to assess for themselves a client's capacity. However, we need not define in detail the contours of this responsibility because here respondent's failure to recognize his client's cognitive limitations stemmed from flagrant violations of other clear and elemental ethical duties.

¶ 32. Although Rule 1.14(a) does not expressly impose a duty on attorneys to assess for themselves their clients' capacity, this basic responsibility is implicit in the rule's structure and purpose. The provision requires attorneys to attempt to maintain a "normal client-lawyer relationship" despite their client's diminished capacity. The fact that the rule exists at all strongly suggests that a lawyer has some obligation to determine the client's ability to communicate, comprehend, and make informed decisions. Otherwise, the lawyer would have no way of knowing if the rule applies to any given lawyer-client relationship. In the course of engaging with a client

14

to handle an estate-planning matter, as in this case, the attorney will necessarily assess the client's capacity. As the ABA Commission on Law and Aging explains:

> In non-adversarial situations, such as estate planning or the handling of specific transactions, issues of capacity are confronted more informally in the daily practice setting. In this setting, legal practitioners by necessity make implicit determinations of clients' capacity at at least two points. First, the lawyer must determine whether or not a prospective client has sufficient legal capacity to enter into a contract for the lawyer's services. Failing this, representation cannot proceed.

> Second, the lawyer must evaluate the client's legal capacity to carry out the specific legal transactions desired as part of the representation (e.g., making a will, buying real estate, executing a trust, making a gift, etc.). Fortunately, for the typical adult client, the presence of adequate capacity is obvious.

Am. Bar Ass'n Comm'n on Law and Aging, Assessment of Older Adults with Diminished Capacity: A Handbook for Lawyers, SM054 ALI-ABA 89, 99 (2006) [hereinafter ABA Handbook].[2]

¶ 33. The implicit requirement in Rule 1.14 for attorneys to assess clients' capacity is made even clearer by paragraph (b) of the rule and corresponding commentary. Paragraph (b) sets forth certain steps that a lawyer may take to protect the client "[w]hen the lawyer reasonably believes that the client has diminished capacity." V.R.Pr.C. 1.14(b). Comment 5 to Rule 1.14 confirms that paragraphs (a) and (b) work in tandem:

> If a lawyer reasonably believes that a client is at risk of substantial physical, financial or other harm unless action is taken, and that a normal client-lawyer relationship cannot be maintained as provided in paragraph (a) because the client lacks sufficient capacity to communicate or to make adequately considered decisions in connection with the representation, then paragraph (b) permits the lawyer to take protective measures deemed necessary.

---

[2] This publication interprets and provides guidance regarding the American Bar Association's Model Rule of Professional Conduct 1.14, which is identical to Vermont Rule 1.14. As such, we find it persuasive.

V.R.Pr.C. 1.14, cmt. 5. A lawyer cannot form a reasonable belief regarding the client's capacity without undertaking a reasonable effort to assess capacity. Thus, the rule requires an attorney to make a reasonable effort to assess each client's capacity as a threshold step to determine whether and to what extent to undertake responsibilities in paragraphs (a) and (b). Despite respondent's protestations, he appears to agree with this standard. He concedes that "a lawyer must be reasonably alert to a client's mental status" and must "make his or her own determination of whether a client has diminished capacity." We agree.

¶ 34. We note that what constitutes a reasonable effort may differ depending on the circumstances of each client, their relationship with the attorney, and the matter being handled. In this case, it suffices to state that where a client's diminished capacity becomes, or should be, obvious through the lawyer's execution of basic duties to the client—such as communicating back and forth to learn what the client wishes to accomplish and why the client wants to retain the lawyer—the lawyer must, "as far as reasonably possible, maintain a normal client-lawyer relationship." V.R.Pr.C. 1.14(a). It would be impossible for a lawyer to faithfully execute fundamental duties to the client—for example, communicating effectively and providing competent representation—if the lawyer could turn a blind eye to blatant cognitive impairments and proclaim ignorance of a client's mental condition. Here, the evidence and the panel's findings support that discovering E.M.'s lack of capacity would have been a natural result of respondent carrying out fundamental ethical duties to his client. As such, there can be no question that Rule 1.14(a) applied, and that respondent violated it. We need not and do not determine today how a lawyer should attempt to assess and handle subtler cognitive impairments, as they are not presented here.

¶ 35. Respondent suggests that the panel unfairly held him to a standard whereby he needed to determine E.M.'s specific medical conditions. The panel imposed no such requirement and nothing in the rule supports this interpretation. Capacity is defined in the rule not by medical

or psychological terminology, but in language familiar to lawyers: "capacity to make adequately considered decisions in connection with a representation."[3] V.R.Pr.C. 1.14(a). And the plain language of the rule indicates that a client's capacity does not depend on any particular diagnosis. It explains that a client's capacity can be diminished because of "minority, mental impairment or for some other reason." V.R.Pr.C. 1.14(a). To the extent respondent was unsure of his obligations under Rule 1.14, the official comments provided clear guidance. In particular, Comment 6 states:

> In determining the extent of the client's diminished capacity, the lawyer should consider and balance such factors as: the client's ability to articulate reasoning leading to a decision, variability of state of mind and ability to appreciate consequences of a decision; the substantive fairness of a decision; and the consistency of a decision with the known long-term commitments and values of the client. In appropriate circumstances, the lawyer may seek guidance from an appropriate diagnostician.

V.R.Pr.C. 1.14, cmt. 6. This comment outlines factors for an attorney to consider, none of which requires medical expertise. To the extent that a specific diagnosis may be helpful or necessary, the comment does not suggest that the lawyer attempt to conduct a psychological evaluation; it provides that the attorney may contact an appropriate professional. Id.; see also ABA Handbook at 101 (discussing Comment 6 to Model Rule of Professional Conduct 1.14, identical to Vermont's Comment 6, and explaining that this assessment process "does not plunge lawyers into the task of clinical assessment" and that "these guidelines recommend against conducting clinical

---

[3] We note that, apart from the language in Rule 1.14(a), there are different definitions of capacity for different types of legal transactions and proceedings. Compare, e.g., Landmark Tr. (USA), Inc. v. Goodhue, 172 Vt. 515, 519, 782 A.2d 1219, 1224 (2001) (explaining that test for testamentary capacity is "whether the testator had sufficient mind and memory at the time of making the will to remember who were the natural objects of his bounty, recall to mind his property, and dispose of it understandingly according to some plan formed in his mind" (quotation omitted)) with id. (explaining that test for donative capacity is whether "donor has sufficient mental capacity to make a gift when the donor understands and comprehends in a reasonable manner the nature and effect of the gift"). Neither the panel nor the parties addressed these distinctions. We need not decide whether or to what extent the test for capacity in Rule 1.14(a) differs from other definitions because the evidence and the panel's findings support that E.M.'s cognitive functioning was so impaired that she lacked capacity to make decisions related to any legal transaction. In particular, the panel found that she would not have been able to even minimally understand the legal documents she signed or the consequences thereof.

psychological screenings . . . unless one is professionally trained in such testing"). Respondent was not required, or even encouraged, to attempt to diagnose E.M.'s specific medical conditions himself. And such diagnoses were not necessary to assess whether she had capacity to "make adequately considered decisions" regarding the transactions with which respondent was assisting her. V.R.Pr.C. 1.14(a).

¶ 36. Respondent points to evidence that he believes demonstrates that he made a reasonable effort to assess E.M.'s capacity—namely, his testimony that he asked J.M. if E.M. had any mental issues and made direct eye contact with E.M. during one of their meetings. Relying solely on the word of a third party without conversing directly with the client does not constitute a reasonable effort, especially where the third party is directing and benefitting from the legal transactions. See V.R.Pr.C. 1.14, cmt. 3 (explaining that "[t]he client may wish to have family members or other persons participate in discussions with the lawyer," but the lawyer "must look to the client, and not family members, to make decisions on the client's behalf"). Disciplinary Counsel presented substantial circumstantial evidence supporting that E.M. lacked capacity throughout her legal relationship with respondent and that her cognitive impairment would have been obvious immediately upon talking with her. The panel was free to rely on this evidence and give lesser weight to respondent's self-serving testimony that his actions were sufficient to ensure that E.M. understood the documents she was signing and they were consistent with her wishes. See In re Rosenfeld, 157 Vt. 537, 543, 601 A.2d 972, 975 (1991) (per curiam) (explaining that, as trier of fact, "it was for the [hearing panel] to determine the weight of the evidence and the persuasive effect of the testimony").

¶ 37. Similarly, respondent emphasizes medical evidence suggesting uncertainty about E.M.'s mental functioning and that E.M. had cognitive good days and bad days. But other medical evidence showed a long history of dementia, Alzheimer's, and consistent cognitive decline. And E.M.'s longtime primary care physician testified that even on days when E.M. was more alert or

18

awake, she still could not even recognize her children or remember their names. It was the panel's prerogative to assess credibility and weigh this evidence, and we will not usurp its role. Id. Based on the panel's well-supported findings, E.M.'s diminished capacity would have been obvious to anyone having even a short conversation with her. Respondent cannot be excused from compliance with the rule governing clients with diminished capacity simply because he failed to discover her obvious impairments through egregious violations of his duties of communication and competent representation.

¶ 38. To the extent respondent argues that he was deprived of due process or other rights because he did not realize that he had an ethical obligation to assess his client's capacity, we are not persuaded. This amounts to an ignorance-of-the-law defense, which we have repeatedly rejected. See, e.g., Robinson, 2019 VT 8, ¶ 37 (rejecting attorney's argument that his mental state was negligent and not knowing because he misapprehended governing Professional Conduct Rule); In re Bowen, 2021 VT 7, ¶ 34, 214 Vt. 154, 252 A.3d 300 (same). "[T]he maxim that mere ignorance of the law constitutes no defense to its enforcement . . . applies with particular force to lawyers, who are charged with notice of the rules and the standards of ethical and professional conduct prescribed by the Court." Bowen, 2021 VT 7, ¶ 35 (quotations omitted). "Vermont attorneys are tasked with maintaining conversance in the ethical obligations governing their profession." Id. An attorney's mistaken understanding of ethical responsibilities or "failure to conduct adequate legal research" does not mean the attorney is deprived of fair notice of those responsibilities and does not make the attorney less culpable. Robinson, 2019 VT 8, ¶ 37.

C. Evidentiary Issues

¶ 39. Respondent argues that the panel's findings regarding E.M.'s capacity were supported by inadmissible evidence. He reiterates objections raised in his motion in limine to exclude the testimony of Dr. Gunther as inconsistent with Vermont Rules of Evidence 402, 602, 701, and 702. In particular, respondent argues that the panel improperly admitted and relied on

19

his testimony because Dr. Gunther—E.M.'s longtime primary care physician—was not a qualified expert regarding Alzheimer's disease or symptom fluctuation, and he could only speculate as to whether E.M. had capacity on the specific dates when respondent met with her.

¶ 40.  We review evidentiary rulings for abuse of discretion.  USGen New England, Inc. v. Town of Rockingham, 2004 VT 90, ¶ 22, 177 Vt. 193, 862 A.2d 269.  Respondent's argument rests on the incorrect premise that Dr. Gunther provided an opinion as to whether E.M. was competent on the specific days that respondent met with her.  He did not.  Indeed, respondent cites in his appellate brief the portion of cross-examination in which Dr. Gunther explicitly testified that he could not offer an opinion as to E.M.'s capacity on the specific dates when respondent met with her.  Rather, he testified about his personal knowledge and experiences with E.M. as her general practitioner from 2001 through her death in 2017, having made in-home-care visits to her every six weeks during the entire period when respondent was representing E.M.

¶ 41.  Dr. Gunther testified, and the panel found, as follows.  Since at least 2009, E.M. suffered from dementia and Alzheimer's disease.  After her husband passed away in 2014, she suffered a precipitous decline in her mental and physical health and had advancing Alzheimer's disease and dementia.  During 2015 to 2016, she had little to no ability to care for herself; she could not read, write, make phone calls, or otherwise communicate.  She would answer "yes" or "no" to questions but her answers were not clearly related to the questions asked.  She often spoke in "word salad," mumbling nonsensical and unrelated words intermittently.  Although on some days E.M. would be more awake or alert, her cognitive abilities never improved and continuously declined during the six-year period prior to her death.  Given all of these outward signs, Dr. Gunther testified that during 2015 to 2016, it would have been apparent within five minutes of spending time with E.M. that she was significantly cognitively impaired.  Based on this evidence and corroborating testimony from one of E.M.'s daughters, the panel found that E.M. lacked

capacity during all of respondent's meetings with her and that her mental impairment would have been obvious during even a short conversation with her.

¶ 42.    The strong circumstantial evidence was sufficient to support this finding; the panel did not need a specific expert opinion as to E.M.'s capacity on the dates when respondent met with her. It is well-established that a trier of fact may rely on circumstantial evidence and doing so does not amount to speculation. See, e.g., State v. McAllister, 2008 VT 3, ¶¶ 17, 23, 183 Vt. 126, 945 A.2d 863 (explaining that "[t]he law makes no distinction between the weight given to either direct or circumstantial evidence" and affirming criminal convictions based largely on circumstantial evidence). Nor was Dr. Gunther's testimony speculative, irrelevant, or otherwise improper; he testified regarding his personal knowledge of E.M. and his medical opinions of her conditions based on his observations and his expertise as a physician. The panel did not abuse its discretion in admitting and relying on Dr. Gunther's testimony.

¶ 43.    To the extent that respondent challenges Dr. Gunther's qualification to provide the general medical opinions that he offered, we reject that argument. We review rulings under Vermont Rule of Evidence 702 for abuse of discretion. USGen New England, 2004 VT 90, ¶ 21. Respondent's own counsel elicited testimony on cross-examination that Dr. Gunther was a licensed physician in the State of Vermont for thirty-nine years with a specialty in adult internal medicine, and that he obtained training in dementia and Alzheimer's disease through continuing education seminars throughout his career. The panel acted within its discretion in determining that these credentials were adequate for Dr. Gunther to testify as an expert witness under Rule 702.

¶ 44.    Respondent also argues that the panel ignored evidence that favored him, including medical records showing E.M. to be coherent when she met with medical providers in September 2015 and January 2016; Dr. Gunther's and Dr. Nash's testimony that sufferers of Alzheimer's disease may have symptom fluctuation and thus can have greater or lesser cognitive function from one day to the next; and respondent's testimony regarding his statements and actions during a

21

meeting with E.M. This argument goes to the weight of the evidence, not its admissibility. The panel was not required to make findings regarding every piece of evidence, nor does the existence of countervailing evidence undermine the panel's findings. Bowen, 2021 VT 7, ¶ 22 ("[F]indings remain undisturbed even where contradicted by substantial evidence. . . . [A]n appellant must show that there is no credible evidence to support the findings." (quotation omitted)). We affirm its findings because they are based on credible record evidence.

¶ 45. Respondent additionally contends, in passing, that the panel's findings about J.M. giving respondent a $1000 gift were founded on inadmissible evidence. Respondent does not indicate whether or how he preserved this contention for our review by raising it below. Bull, 170 Vt. at 459, 752 A.2d at 33. Moreover, this one-sentence argument is inadequately briefed. See Johnson v. Johnson, 158 Vt. 160, 164 n.*, 605 A.2d 857, 859 n.* (1992) (explaining that Supreme Court will not address contentions so inadequately briefed as to fail to minimally meet standards of V.R.A.P. 28(a)). In any event, we see nothing improper about the finding or its supporting evidence. Respondent himself testified specifically about this gift, and the panel simply credited his testimony.

## D. Appropriate Sanction

¶ 46. Although the panel imposed a five-month suspension, we are not bound by that sanction determination. Kulig, 2022 VT 33, ¶ 30. "The purpose of sanctions is not to punish attorneys, but rather to protect the public from harm and to maintain confidence in our legal institutions by deterring future misconduct." In re Obregon, 2016 VT 32, ¶ 19, 201 Vt. 463, 145 A.3d 226 (quotation omitted); see also In re Warren, 167 Vt. 259, 263, 704 A.2d 789, 792 (1997) ("Sanctions are intended to protect the public from lawyers who have not properly discharged their professional duties and to maintain public confidence in the bar."). "In crafting a sanction, we are guided by the American Bar Association Standards for Imposing Lawyer Discipline" but not bound by them. Bowen, 2021 VT 7, ¶ 28; see also ABA Center for Professional Responsibility,

Standards for Imposing Lawyer Sanctions (1986) (amended 1992) [hereinafter ABA Standards]. Under the ABA Standards, the panel, and we in turn, "weigh [1] the duty violated, [2] the attorney's mental state, [3] the actual or potential injury caused by the misconduct, and [4] the existence of aggravating or mitigating factors." In re Andres, 2004 VT 71, ¶ 14, 177 Vt. 511, 857 A.2d 803 (mem.). Based on the first three factors, the ABA Standards indicate a "presumptive sanction," which may be modified by aggravating or mitigating factors. Bowen, 2021 VT 7, ¶ 28. For the following reasons, we conclude that a one-year suspension is the appropriate sanction for respondent's violations.

## 1. Nature of Duties Violated

¶ 47. A key consideration with respect to the nature of the duties violated is whether the duties in question were owed to a client, the public, the legal system, or the profession. "[T]he most important ethical duties are those obligations which a lawyer owes to clients" because they "arise out of the nature of the basic relationship between the lawyer and the client" and "form[] the very foundation of an attorney's ethical responsibilities." Id. ¶ 30 (quotations and alterations omitted). The three rules that respondent violated were among the most elemental duties owed to a client. He owed E.M. the duty to reasonably attempt to maintain a normal lawyer-client relationship despite her diminished capacity; the duty to competently represent her with respect to estate-planning decisions; and the duty to communicate with her directly so that she could make informed decisions. We agree with the panel's reasoning that:

> There is perhaps no more basic duty to a client than understanding why one is being retained. It is impossible to carry out a client's wishes if the attorney never asks the client what they want to accomplish. Hearing a feeble client only through the voice of the son who was the beneficiary of proposed wholesale changes to an estate plan, and getting instructions to prepare a series of instruments by which the son gets his mother's entire estate to the exclusion of the client's daughters, is both out of the ordinary and suspicious on its face. Respondent did not have a normal attorney-client relationship with EM because he never once called or communicated with her privately, or asked her to articulate what she wanted.

23

Based on the panel's findings, respondent's actions (or lack thereof) would have violated Rules 1.1 and 1.4(b) with respect to even the most fully-functioning, sophisticated estate-planning client. That respondent abdicated these duties so completely as to prevent him from discovering E.M.'s obvious and significant mental impairment did not absolve him from duties under Rule 1.14(a); rather, it made all of the violations more concerning.

## 2. Respondent's State of Mind

¶ 48.   In evaluating state of mind, the panel appropriately considered whether respondent acted intentionally, knowingly, or negligently. Intentional or knowing conduct supports a stronger sanction than negligent conduct. Acting with "knowledge" involves "conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result." In re Fink, 2011 VT 42, ¶ 37, 189 Vt. 470, 22 A.3d 461 (quoting ABA Standards, Definitions). Acting with "negligence" means "when a lawyer fails 'to heed a substantial risk that circumstances exist or that a result will follow, which failure is a deviation from the standard of care that a reasonable lawyer would exercise in the situation.' " Id. (quoting ABA Standards, Definitions). In distinguishing between negligent and knowing behavior, the key question is, "was the lawyer aware of the circumstances that formed the basis for the violation? If so, the conduct was done knowingly. If the lawyer instead acted without awareness, but below the accepted standard of care, then he acted negligently." Id. ¶ 38. Because "[t]he line between negligent acts and acts with knowledge can be fine and difficult to discern," and this inquiry is fact-dependent, "we give deference to the panel's assessment of an attorney's mental state." Id.

¶ 49.   Here the panel concluded that respondent committed all three of the violations knowingly. The panel reasoned that if respondent's representation had ended after his initial work in June 2015 drafting and helping E.M. execute a deed, it might have concluded that his violations were merely negligent, given the limited scope of that representation. As it explained, however,

24

his representation of EM did not end and [r]espondent had many months to contemplate the transaction, call his client or her daughters, or in some way seek confirmation that he was carrying out EM's wishes and not those of her son. He nonetheless drafted documents, at son's insistence, despite knowing that this would likely affect EM's Medicaid benefits and disinherit EM's daughters. The danger of getting instructions only from the beneficiary was obvious.

We see no clear error in the panel's assessment of respondent's mental state. Respondent has practiced law for several decades and his focus is on real property and probate matters—precisely the type of matters he handled for E.M. As the panel reasonably summarized, a lawyer handling an estate-planning matter "will discuss with his or her client two things: what do you have, and who are the people closest to you . . . . Here, [r]espondent need only have asked his client for the names of her children to discover her cognitive impairment."

¶ 50. The panel noted numerous suspicious circumstances, all of which respondent knew of, and any one of which should have alerted respondent to the fact that E.M. was not making informed, rational decisions and prompted him to inquire further. These included that J.M. was present for every client meeting and respondent never spoke with E.M. alone; respondent relied solely on assurances from J.M. that she was fully competent; E.M. never answered respondent with more than a single-word response; respondent was fully aware that he was assisting E.M. with legal transactions that could be against her interest and benefit J.M. to the detriment of E.M.'s other children, yet followed J.M.'s directions without asking E.M. about alternatives or why she wanted to make these changes; J.M. always insisted without explanation that the client meetings be in parking lots, even when just a few blocks from E.M.'s home; and respondent accepted a $1000 cash gift from J.M. separate from any legal fees due. All of these findings supported that respondent was "aware of the circumstances that formed the basis for the violation[s]" and thus knowingly transgressed the relevant rules. Fink, 2011 VT 42, ¶ 38.

¶ 51. Respondent argues that the panel was bound to accept and adopt his admissions to the petition of misconduct, specifically, that he negligently (but not knowingly) violated Rules 1.1

25

and 1.4(b), even though the petition of misconduct alleged no particular state of mind. In effect, he asserts that he can force the panel to accept a less-culpable state of mind and thereby secure a lighter sanction for himself, even if the evidence would show a more-culpable state of mind. This contention has no basis in applicable law and would undermine the very purpose of disciplinary proceedings.

¶ 52. Respondent's citations to case law discussing the effect of admissions in an answer to a complaint filed in a civil suit are inapposite. See, e.g., Oakes v. Buckman, 87 Vt. 187, 190, 88 A. 736, 738 (1913). Administrative Order 9 does not allow the parties to stipulate that a violation of the Rules of Professional Conduct has occurred, let alone permit one party to unilaterally decide which violations occurred and under what mental state. Even where proceedings are initiated by the parties' stipulation of facts, the hearing panel may reject the stipulation or "accept the stipulation and adopt it as its own findings of fact, although the panel may take further evidence on the issue of sanctions." A.O. 9, Rule 13(D)(5)(a)(ii). Where, as here, proceedings are initiated by petition, "disciplinary counsel shall have the burden of proving the alleged violations by clear and convincing evidence." A.O. 9, Rule 13(D)(5)(b). "The hearing panel shall in every case issue a decision containing its findings of fact, conclusions of law, and the sanction imposed, if any . . . ." A.O. 9, Rule 13(D)(5)(c) (emphasis added). As required, the panel here made an independent determination, based on the evidence presented and application of the disciplinary rules and other relevant law, whether the respondent's conduct amounted to an ethical violation and what the appropriate sanction should be.

¶ 53. Respondent's proposition that his self-serving admissions became "the law of the case" makes no sense considering that the Supreme Court can order review of a panel decision on its own motion, as we have done here. A.O. 9, Rule 13(E). Although we are deferential to the panel's findings of fact, we owe no deference to statements in the parties' pleadings, and we review de novo any legal conclusions. Kulig, 2022 VT 33, ¶ 30. We uphold the panel's finding that

26

respondent knowingly violated Rules 1.1, 1.14(a), and 1.4(b) of the Vermont Rules of Professional Conduct.

### 3. Resulting Injury

¶ 54.    Respondent does not challenge the panel's findings regarding the extent of injury caused by his violations.  The panel found that, due to the documents prepared by respondent, E.M. was deprived of regular contact with her daughters and the family was forced to retain counsel and engage in multiple legal actions, including an emergency guardianship proceeding and a malpractice lawsuit against respondent.  It found further that "years of intrafamily litigation are enormously damaging and have consequences that may well be permanent . . . . [T]here were in fact actual injuries, both economic and personal, caused by [r]espondent's misconduct."  Indeed, the panel found, based on testimony of family members, that these legal proceedings affected the entire family and soured their relationship with J.M.'s son, with whom they had been particularly close.  At the time of the merits hearing, litigation had been ongoing for over five years, and probate proceedings remained pending.  Although E.M.'s family succeeded in recouping their alleged losses through a malpractice action against respondent, the panel found, and respondent does not contest, that there was still an actual economic loss through the principle of time-value from losing the equity in E.M.'s house for over five years.  See Town of Ira v. Vt. League of Cities and Towns, 2014 VT 115, ¶ 3, 198 Vt. 12, 109 A.3d 893 ("[T]he 'time value of money' . . . is[] the interest lost because the money was not available to invest or hold to earn interest.").  The serious and lasting emotional toll on E.M.'s family is also an actual injury.  See Bowen, 2021 VT 7, ¶¶ 37-38 (recognizing that clients' stress and anxiety resulting from attorney's misconduct was actual injury).  This extensive litigation caused by respondent's conduct additionally harmed the general public and the legal system by draining judicial resources.  See ABA Standards, Definitions (defining "injury" as "harm to a client, the public, the legal system, or the profession which results from a lawyer's misconduct").  Finally, as the panel aptly recognized, E.M.'s

family's success in eventually recouping losses does nothing to lessen the potential damages caused by respondent's misconduct. If respondent had been uninsured or the family could not afford legal representation, or the documents respondent executed had not come to the family's attention for an extended period, the personal and financial consequences to E.M.'s family could have been even more serious and far-reaching.

### 4. Presumptive Sanction

¶ 55. Section 4.42(a) of the ABA Standards provides that—absent aggravating or mitigating factors—suspension is appropriate where "a lawyer knowingly fails to perform services for a client and causes injury or potential injury to a client." Section 4.41(b) states that disbarment is appropriate where "a lawyer knowingly fails to perform services for a client and causes serious or potentially serious injury to a client." Thus, the severity of the injury or potential injury may mean the difference between suspension and disbarment. While we do not think that disbarment is an appropriate baseline sanction in this case, the significance of the actual and potential injuries caused by respondent's conduct informs our consideration of the appropriate length of suspension. The ABA Standards provide that a suspension should generally have a duration of at least six months and no more than three years. ABA Standards, § 2.3.

### 5. Aggravating and Mitigating Factors

¶ 56. In considering a deviation from the presumptive sanction, the aggravating and mitigating factors from ABA Standards §§ 9.22 and 9.32 are relevant. The panel noted numerous aggravating factors, including that: there was a pattern of misconduct for more than one year during which respondent had ample opportunity to communicate privately with his client; respondent failed to show remorse by not acknowledging the wrongful nature of his conduct and arguing that E.M.'s family did not suffer harm; E.M. was a particularly vulnerable client given her advanced age and fragile mental and physical health; and respondent had several decades of experience practicing law and was undertaking a matter squarely within his specialty. We agree with these

28

factors, but we see two additional aggravating factors. First, respondent violated three distinct ethical rules. See Robinson, 2019 VT 8, ¶ 72 n.15 (explaining that violation of multiple Professional Rules implicates § 9.22(d)). Second, the $1000 gift that respondent accepted from J.M. deeply troubles us. Although this fact does not neatly fall under any of the enumerated factors in the ABA Standards, these are not meant to be exhaustive. See ABA Standards, § 9.2 (defining "aggravating circumstances" as "any considerations or factors that may justify an increase in the degree of discipline to be imposed" and enumerating "factors which may be considered in aggravation" (emphasis added)); Bowen, 2021 VT 7, ¶ 42 ("The ABA Standards set forth these nonexclusive factors at §§ 9.2 and 9.3."). The circumstances surrounding this gift—that it was offered and accepted when no legal bills were due and while J.M. was benefitting directly from respondent's work to the detriment of the client and other family members—may not rise to the level of a "dishonest or selfish motive," ABA Standards, § 9.22(b), but they cast doubt on respondent's professional judgment and loyalty to his client, and undermine public perception of the integrity of the bar. See Kulig, 2022 VT 33, ¶ 51 (explaining that "[a]n attorney has a duty to represent the client with undivided loyalty, which forms part of the foundation of the attorney-client relationship" and that attorneys must "avoid even the appearance of impropriety" to maintain public confidence in the bar (quotations omitted)). Thus, the gift cannot be ignored in considering a sanction.

¶ 57. The panel also identified the following mitigating factors: respondent had no prior disciplinary record; there was no evidence of a dishonest or selfish motive; and respondent cooperated with Disciplinary Counsel. While respondent's lack of prior complaints or discipline against him throughout his long career is important, the other two factors carry less weight. The lack of a dishonest or selfish motive is undermined somewhat by the circumstances surrounding J.M.'s $1000 gift to respondent. And "because attorneys have an independent professional duty to cooperate with disciplinary investigations under Rule 8.1(b), [respondent's cooperative attitude]

29

is afforded little weight." Bowen, 2021 VT 7, ¶ 45. Thus, "[t]he aggravating factors predominate here," id., and justify an increase to the presumptive sanction.

### 6. Prior Cases

¶ 58.    The panel and this Court also look to sanctions imposed in similar prior disciplinary cases to achieve consistency. In re Neisner, 2010 VT 102, ¶ 26, 189 Vt. 145, 16 A.3d 587. In concluding that a five-month suspension was appropriate, the panel cited several cases and relied particularly heavily on In re Kulig, 2022 VT 33, and In re Bowen, 2021 VT 7.

¶ 59.    In both cases, like this one, the respondent-attorney was a highly experienced practitioner with no prior disciplinary record who knowingly violated the Professional Conduct Rules. In Bowen, we affirmed conclusions that Mr. Bowen violated Rules 1.8(b) and 1.9(c)(2) for revealing confidential information obtained from a former client and using that information to the former client's disadvantage. 2021 VT 7, ¶¶ 21, 26-27. Mr. Bowen effectively leveraged this confidential information in a real-estate transaction in which his new clients were adverse to the former client, to attempt to collect unpaid legal fees from the former client. Mr. Bowen's conduct caused emotional harm to both the new and former clients, and further caused potential injury because the real-estate sale could reasonably have collapsed from Mr. Bowen's actions, even though it ultimately did not. Id. ¶¶ 37-40. We affirmed a three-month suspension.

¶ 60.    Although Bowen involved a dishonest and selfish motive, which is not present here, other factors urge a harsher sanction in this case. In particular, the harm in this case is more extensive and lasting: respondent's actions caused such great damage that it took his client's family more than five years of litigation involving multiple different proceedings to claw back what was rightfully theirs. The litigation itself, which was still ongoing at the time of the merits hearing, caused rifts within the family. And the potential for further personal and economic harm was immense. Additionally, there was no indication that the former client or others harmed by Mr.

Bowen's actions were vulnerable, in stark contrast to respondent's client here. See Robinson, 2019 VT 8, ¶ 78 (emphasizing importance of vulnerability of victim in considering sanction).

¶ 61. In Kulig, the respondent had represented his client for many years on various matters and knew her both as a client and a friend. Four years before her death, the client sought Mr. Kulig's help in crafting an estate plan. They engaged in discussions while she was fully competent. Although the client indicated that she wanted to leave some or all of her assets to Mr. Kulig, he did not disclose the conflict of interest to the client or obtain informed consent to waive it. When later confronted by the presumptive beneficiaries of the client's estate, Mr. Kulig claimed he was holding her property under an oral trust. We affirmed violations of Rules 1.7 and 1.8 but increased the panel's recommended sanction of a three-month suspension to five months. Kulig, 2022 VT 33, ¶¶ 39, 59.

¶ 62. We view the present case as warranting a harsher sanction than Kulig. E.M. was more vulnerable than the client in Kulig, respondent's ethical violations were more flagrant than Mr. Kulig's, and the injury and potential injury is greater here.

¶ 63. Although Mr. Kulig's conflicts of interest and failures of communication and consent around those conflicts were very concerning, unlike respondent here, he followed his client's directions after discussions leading to his client's decision while the client was fully competent. E.M. was obviously not competent at any point during respondent's representation of her. She was ninety-one years old, physically frail, and could neither identify her own children nor hold a conversation. See Robinson, 2019 VT 8, ¶ 78 (emphasizing importance of vulnerability of victim in considering sanction). Respondent ignored numerous red flags—both regarding E.M.'s lack of capacity and the riskiness or unfairness of the transactions that J.M. directed respondent to arrange. Over the course of several transactions spanning more than a year, which were directed exclusively by J.M., and which effectively overhauled E.M.'s existing estate plan to benefit J.M. at the expense of E.M. and her daughters, respondent never obtained more than a "yes

or no" answer from E.M. regarding documents he or J.M. had previously prepared and was presenting for her signature. He never met with her privately, never asked her what assets she had or who she wanted to give them to, and never advised her about the risks of and alternatives to the estate-planning documents he had prepared for her. Unlike Mr. Kulig's client, respondent did not previously know E.M., making it even more imperative that he engage in back-and-forth communication to understand her goals, her assets, and, most critically, why she wished to retain the services of an attorney. Although self-dealing was not an issue in this case as in Kulig, we are deeply troubled by the $1000 gift that respondent accepted from J.M.

¶ 64.   Finally, we conclude that the injury in this case is greater than that in Kulig. The Kulig Court noted that the unwaivable conflict of interest caused actual injury to the client and the legal profession because the client was deprived of independent advice. 2022 VT 33, ¶ 59. It also noted numerous potential harms—including that the will and deed could later be challenged, the client's family had no way to know if the documents were the product of undue influence, and if Mr. Kulig had died, the client's family would have been deprived of their inheritance because by law the assets would have passed to Mr. Kulig's heirs. Id. ¶ 54. However, the Court determined that the harms were tempered by the fact that Mr. Kulig disclaimed any interest in the client's property. Id. ¶¶ 28, 41. In the present case, the actual harms are both personal and financial. And unlike in Kulig, where the attorney disclaimed his interest, allowing the intended beneficiaries to obtain their inheritance without great effort, E.M.'s family had to engage in litigation against both J.M. and respondent, in multiple venues, over many years. The potential harms were even more serious.

¶ 65.   The flagrance of respondent's violations—the completeness of his failure to even attempt to maintain anything close to a normal attorney-client relationship with E.M. in the face of numerous suspicious circumstances—is magnified by E.M.'s particularly vulnerable state, respondent's extensive experience in this area of the law and dealing with elderly clients,

32

respondent's lack of recognition of the gravity of these transgressions, the troubling circumstances under which he accepted a $1000 gift from J.M., and the significant harm respondent caused. Given all the circumstances, respondent poses a serious risk to potential future clients and public trust in the legal profession. "[T]he public is protected when sanctions are imposed that are commensurate with the nature and gravity of the violations and the intent with which they were committed." Id. ¶ 58 (quotation omitted). Therefore, " '[t]he appropriate sanction must be weighty enough to counter [the] serious risk[s]' presented by such conduct." Id. (quoting Bowen, 2021 VT 7, ¶ 50). Not for punishment, but to protect the public and maintain confidence in the bar, we conclude that a one-year suspension is appropriate.

Respondent is suspended from the practice of law for one year, effective as of the date that the mandate executes under Vermont Rule of Appellate Procedure 41. Respondent is directed to comply with the requirements of A.O. 9, Rules 26 and 27.

BY THE COURT:

_____
Harold E. Eaton, Jr., Associate Justice


_____
Karen R. Carroll, Associate Justice


_____
William D. Cohen, Associate Justice


_____
Nancy J. Waples, Associate Justice


_____
Timothy B. Tomasi, Superior Judge,
Specially Assigned